Pam **ARMSTRONG**, Plaintiff,

v.

**FLOWERS HOSPITAL,
INC., Defendant.**

No. CV 92–A–101–S.

United States District Court,
M.D. Alabama, S.D.

Feb. 9, 1993.

Truman M. Hobbs, Jr., Montgomery, AL, for plaintiff.

Joseph C. Espy, III, Montgomery, AL, L. Traywick Duffie, Terri L. Rosen, Atlanta, GA, for defendant.

## MEMORANDUM OPINION & ORDER

ALBRITTON, District Judge.

This cause is before the court on defendant's motion for partial summary judgment, filed on September 15, 1992. In its motion, defendant asserts that plaintiff is unable to establish a prima facie case for her claims of discrimination under Title VII, and fraudulent misrepresentation under Alabama state law, and, therefore, defendant's motion for summary judgment as to those claims are, as a matter of law, due to be granted.

Plaintiff filed a response to defendant's motion for partial summary judgment on October 13, 1992.

For the following reasons, the defendant's motion for partial summary judgment as it applies to both the Title VII claim and the fraudulent misrepresentation claims are due to be granted.

## I.  FACTS

Plaintiff filed this suit on January 22, 1992 alleging a violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), codified as 42 U.S. § 2000e(k), as well as fraudulent misrepresentation, and breach of contract.

### A.  Title VII Claim

Plaintiff Pam Armstrong was employed by Flowers Hospital as a nurse in the Home Care Services division of the hospital. Her employment in this position required her to visit and treat patients in their homes. Plaintiff was assigned patients in the Headland, Midland and Dothan areas, and worked during the day, Monday through Friday. When plaintiff was initially hired, she was required to attend a one-day orientation, and following that orientation, she spent the first two weeks riding with another nurse. Upon completion of that two week period, plaintiff was assigned a number of patients with varying conditions.[1]

On December 12, 1990, plaintiff was informed that she had been assigned a patient who was diagnosed as HIV positive.[2] He was further diagnosed as having cryptococcal meningitis which is an infectious disease common among AIDS patients.[3]

---

1.  Such conditions included congestive heart failure, Parkinson's disease, emphysema, diabetes, dressing changes, and the use of a Foley catheter.

2.  This assignment was to commence on December 14, 1990, and required daily treatment for twenty-nine days.

3.  There is evidence that persons who are infected with the AIDS virus do not die as a result of AIDS, but rather as a result of an opportunistic

On the same day, plaintiff informed Cheryl Wynn, her supervisor at Home Care Services, that she did not believe she should treat this patient because she was in the first trimester of her pregnancy.[4] She expressed concern that if she were required to treat this patient, she might jeopardize her baby. Plaintiff stated that it was not the presence of AIDS that concerned her as much as the opportunistic infections commonly present in AIDS patients. She further stated that it was not her own health that she was concerned about, because she, as a healthy adult, would be capable of recovery from most of these opportunistic infections.

Cheryl Wynn informed plaintiff that the policy of Home Care Services was to not make exceptions and allow reassignment of patients to other nurses. Home Care's policy on the treatment of AIDS patients states that the "Universal Precautions" provided by the Center for Disease Control ("CDC") were to be followed by all nurses in treating patients with infectious diseases. This policy is in accordance with CDC's policy. Any nurse who refused to treat a patient was subject to termination. After discussing the situation with her supervisor, Wynn informed plaintiff that she would be given two days in which to reconsider her decision. If plaintiff still refused to treat the AIDS patient, she would be given the option of resigning or facing termination. On December 14, 1990, plaintiff had not changed her mind about treating the patient, and refused to resign. Therefore, she was terminated.

The defendant states that only one other nurse has refused to provide home care treatment for an AIDS patient. That nurse, who was not pregnant, decided to resign rather than be terminated. Defendants additionally stated that there have been several nurses who have become pregnant and have treated patients infected with the AIDS virus. No other pregnant nurses have refused to treat an AIDS patient under Home Care Services.

The plaintiff stated several reasons why she would be more "at risk" than nonpregnant nurses, and, therefore, should not have been required to treat this patient. Plaintiff stated that patients suffering from the AIDS virus also often suffer from one or more opportunistic infections which take advantage of the AIDS patient's weakened immune system. She feared such accompanying infections as chicken pox, cytomegalovirus ("CMV"), toxoplasmosis, and coxsackievirus. Although plaintiff was unable to articulate that pregnant persons would be more susceptible to transmission of one of these diseases than nonpregnant persons, it is clear that the implications are more grave when the health and safety of the fetus is at risk. Plaintiff did assert that she has gestational diabetes. Thus, she suffers from diabetes only when she is pregnant. However, during the term of her pregnancy, because of her diabetic condition, she has a weakened immune system and might therefore be more susceptible to transmission of infectious diseases.

At the time of plaintiff's assignment to this patient, cryptococcal meningitis was the only accompanying infection that had been diagnosed in addition to the HIV virus. Plaintiff had learned that this patient had been suffering from nausea and vomiting since leaving the hospital.[5]

Plaintiff stated in her deposition that she spoke with nurses at Flowers Hospital. Janie Powell, a nursing supervisor at Flowers Hospital, told her that they do not require pregnant nurses in the hospital to treat patients in "isolation." It is disputed whether this AIDS patient was an "isolation" patient. He was to be treated at home, and not in a hospital isolation area. On the other hand, all of the medical waste that was removed by treating nurses was stamped "isolation." Lydia Carnley, a nurse in the infection control area of Flow-

---

infection which attacks the body after the patient's immune system has deteriorated.

**4.** Plaintiff delivered her baby on June 25, 1991.

**5.** This information was learned from Mary O'Connell, the admission nurse who initially treated the patient at home.

ers Hospital, told the plaintiff that they try to reassign pregnant nurses so as to prevent them from being exposed to very infectious conditions such as chicken pox.

Plaintiff also consulted other persons both before and after her termination as to the policies of other hospitals with regard to treatment of AIDS and other infectious conditions by pregnant nurses. Plaintiff's sister, Christy Eike, who is a home care nurse in St. Louis, Missouri informed her that pregnant nurses in that hospital are reassigned away from AIDS patients specifically because of the accompanying opportunistic infections.

After her termination, plaintiff filed a claim with the Equal Employment Opportunity Commission ("EEOC"). The EEOC investigated the matter and returned a finding that there was no reasonable determination of a Title VII violation.

Plaintiff did not work from the date of her termination, December 14, 1990, until some time after she delivered her child on June 25, 1991. She seeks damages for loss of employment during that time, as well as damages for loss of insurance coverage. Because she was terminated from employment, she was only able to continue her health insurance pursuant to COBRA which was at a greatly increased cost. Eventually, because of the expense involved with the COBRA coverage, plaintiff was forced to terminate that insurance. She was unable to acquire insurance elsewhere which would cover her pregnancy because it was a preexisting condition. Therefore, plaintiff had to settle for her husband's insurance plan which was not a family plan, and was not as comprehensive as the health insurance provided by Flowers Hospital. Plaintiff also has to drive an additional twenty miles to work each day in her current position at Lakeview Community Hospital.

### B. Fraudulent Misrepresentation

Plaintiff Pam Armstrong received her associate's degree in nursing from Wallace College, in Dothan, Alabama in June, 1989. Following her graduation, plaintiff was employed at Southeast Alabama Medical Center ("SAMC"), for one year. During her employment with SAMC, plaintiff entered into a scholarship agreement with SAMC whereby they would pay for her tuition and books, uniforms and some travel expenses, and in return she would remain in their employ for twenty-four months.

Plaintiff left SAMC after twelve months. After that, she was to either buy out her contract with SAMC to reimburse it for the scholarship agreement, or have her subsequent employer purchase the contract. Plaintiff contends that part of the stipulation for her employment with Flowers Hospital was that they would pay off her scholarship with SAMC.

Defendant's supervisor, Cheryl Wynn, testified at deposition that when plaintiff was hired, plaintiff informed her that plaintiff still had an obligation remaining with SAMC on the scholarship. Wynn testified that she spoke with her supervisor, Donna McPherson[6], and they did agree that Flowers Hospital would purchase the scholarship. Armstrong testified that she believed Wynn had called her on the telephone following the interview and informed her that Flowers had accepted her application.

It is undisputed that the scholarship has not been purchased by Flowers Hospital, and is currently in a "hold" status by the personnel department at SAMC.

Donna McPherson testified at deposition that there was no agreement to purchase the scholarship. McPherson stated that no such agreement would exist until plaintiff discussed the situation with her (McPherson) and completed the "Scholarship Loan Agreement." It was, McPherson stated, in the hands of the plaintiff to follow up on the purchase of the scholarship.

There is no evidence that plaintiff ever followed up with the defendants. There is also no evidence that the defendants ever

---

6. Donna McPherson is Director of Clinical Services for Home Care Services, a division of Flowers Hospital.

**1188**

raised the issue with plaintiff after she was hired.

## II. STANDARD OF REVIEW FOR GRANTING SUMMARY JUDGMENT

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." This standard can be met by the moving party, in a case in which the ultimate burden of persuasion at trial rests on him, by showing that undisputed evidence entitles him to judgment as a matter of law as to the claim on which he has the burden. Where the burden of proof is on the non-moving party, this standard can be met either by submitting affirmative evidence negating an essential element of the non-movant's claim, or by demonstrating that the non-moving party's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The burden then shifts to the non-moving party to make a showing sufficient to establish the existence of an essential element to her claims, and on which she bears the burden of proof at trial. *Id.* To meet this burden, the non-moving party cannot rest on the pleadings, but must by affidavit or other appropriate means, set forth specific facts showing that there is a genuine issue for trial. *Fed.R.Civ.P.* 56(e).

It is the substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986). *See also DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499 (11th Cir.1989). All the evidence and the inferences from the underlying facts must be viewed in the light most favorable to the non-moving party. *Earley v. Champion International Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990). *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The moving party bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983).

Thus, the court's function in deciding a motion for summary judgment is to determine whether there exists genuine, material issues of fact to be tried, and if not, whether the moving party is entitled to a judgment as a matter of law. *See Dominick v. Dixie National Life Insurance Company*, 809 F.2d 1559 (11th Cir.1987).

■ Because this matter is before the court on defendant's motion for summary judgment, the defendant must show that there is no issue of material fact and that it is entitled to a judgment as a matter of law. *Fed.R.Civ.P.* 56(c). The burden then shifts to plaintiff, as the non-moving party, to make a showing sufficient to establish the existence of an essential element to her claims, and on which she bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In satisfying this burden, plaintiff may not rest upon the mere allegations or denials of her pleadings, but must, by affidavits or other appropriate means, set forth specific facts showing that there is a genuine issue for trial. *Fed.R.Civ.P.* 56(e); *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991).

## III. ANALYSIS

### A. Title VII—Pregnancy Discrimination Act Claim

■ Plaintiff's claim alleges that the defendant discriminated against her based upon her pregnancy when it required her to treat an AIDS patient or be subject to termination. This action, plaintiff maintains, would place her in the situation of either discontinuing her employment with the defendant or jeopardizing the health of her fetus. It is plaintiff's contention that defendant violated Title VII of the Civil Rights Act of 1964 and specifically the Pregnancy Discrimination Act of 1978, codified as 42 U.S.C. § 2000e(k), when it compelled her, as a condition of continued em-

ployment, to endanger the health of her fetus.

The Pregnancy Discrimination Act of 1978 ("PDA") explicitly included discrimination "... on the basis of sex ... because of or on the basis of pregnancy, childbirth, or related medical conditions" within the purview of sex discrimination under Title VII. 42 U.S.C. § 2000e(k). "By making clear that distinctions based on pregnancy are *per se* violations of Title VII, the bill would eliminate the need in most instances to rely on the [disparate] impact approach, and thus would obviate the difficulties in applying the distinctions created in *Satty*." [7] Prohibition of Sex Discrimination Based on Pregnancy, H.R.Rep. 95–948, p. 3 (1978), U.S.Code Cong. & Admin.News 1978, p. 4749.

### 1. *Disparate Treatment*

The plaintiff contends that the defendant maintains a policy of forcing pregnant women to subject themselves and their unborn children to health risks not faced by men. Plaintiff further alleges that men are treated differently in that they are not forced to take risks which could harm an unborn child. These allegations appear to advance a disparate impact argument rather than a disparate treatment argument.

■ A plaintiff may show pregnancy discrimination based upon disparate treatment by proffering either direct or circumstantial evidence. Here, the plaintiff has failed to offer any direct evidence of disparate treatment between pregnant and nonpregnant employees. The policy of Home Care Services was applied to all nurses regardless of whether or not they were pregnant.

In the absence of direct evidence, a plaintiff may establish a prima facie case of pregnancy discrimination based upon a disparate treatment theory by showing four elements:

(1) that the plaintiff is a member of a group protected by the statute;

(2) that the plaintiff was qualified for the position;

(3) that the plaintiff suffered an adverse effect on her employment (i.e., placement of unfair condition of employment, and discharge);

(4) and that the plaintiff suffered from "differential application of work or disciplinary rules." [8]

*See Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1525 (11th Cir.1991). *See generally McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The same analysis applied in Title VII sex discrimination suits should be applied in cases alleging discrimination on the basis of pregnancy. *Hayes v. Shelby Memorial Hosp.,* 726 F.2d 1543, 1547 (11th Cir.1984).

■ If the plaintiff can establish this prima facie case, the burden shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for the action taken against the plaintiff. *McDonnell Douglas,* 411 U.S. at 803, 93 S.Ct. at 1824. The burden then shifts to the plaintiff to show that the reason given by the defendant is actually a pretext for discrimination based upon pregnancy. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

Here, the plaintiff is unable to establish a prima facie case. It is undisputed that she is a member of a group protected by the statute. The evidence is clear that, at the time of her termination, plaintiff was pregnant.

The second element is also not in dispute. Plaintiff was a registered nurse with experience, and her qualification to be a home healthcare nurse is not challenged.

There are two separate adverse actions claimed by the plaintiff. One, that she was

---

**7.** *Nashville Gas Co. v. Satty,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977) (held that policy depriving women absent from work because of childbirth of accumulated seniority for certain purposes *does* have a disparate impact on women, and *does* violate Title VII. *Satty* was overruled by the PDA to the extent that it held

pregnancy to be a legitimate, non-discriminatory basis for differential treatment).

**8.** *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984) (quoting *Whiting v. Jackson State Univ.,* 616 F.2d 116, 121 (5th Cir.1980)).

terminated from her employment, is clearly not in dispute. The other adverse action claimed by the plaintiff is that the employer placed upon her employment an unfair condition which required her to make the decision to refuse to do her job or risk the health of her fetus. The defendant disputes this as being an adverse action taken by the defendant against the plaintiff. The defendant simply required that all of its employees in the Home Care Services division treat all patients assigned to them. Treatment of an AIDS patient by a nurse is one of the job duties of a nurse. This job duty was expected from nonpregnant nurses as well as pregnant nurses. The policy that the defendant applied whereby any nurse who refused to treat a patient assigned to such nurse was subject to termination was non-discriminatory on its face. There is evidence of only one other nurse refusing to treat an AIDS patient. That nurse, who was not pregnant, actually opted to resign rather than be terminated. The policy was clearly applied to nonpregnant nurses as well as pregnant nurses. Thus, it was non-discriminatory in its application. Therefore, plaintiff is unable to establish that the defendant operated in a manner which treated pregnant and nonpregnant nurses in a disparate manner with regard to the conditions of employment to which they were subjected. Hence, the third element is met only because plaintiff was terminated from employment, a fact which is also not in dispute.

■ As stated in the paragraph above, the fourth element, that the plaintiff suffered from a different application of work or disciplinary rules has been shown to be untrue. The policy of the defendant was applied equally to pregnant and nonpregnant employees. Nurses in both classifications were assigned patients with AIDS and other infectious diseases. There is evidence that in a certain circumstance, nurses would not be required to treat AIDS patients. This circumstance applied to both pregnant and nonpregnant nurses, however.[9] The plaintiff argues that to excuse nurses from treating patients in this circumstance but not when the nurses are pregnant serves to discriminate against pregnant nurses. While this may be true, every action in which one group of employees is treated differently from another group is an act of discrimination. However, not all acts of discrimination are illegal. The plaintiff must make a prima facie case showing that the discrimination is pregnancy-related. Here, the plaintiff was *not* discriminated against because of her pregnancy.[10] It is clear that she was terminated because she refused to do her job.

Therefore, the plaintiff's claim of disparate treatment is without merit, and the defendant's motion for summary judgment as it concerns the disparate treatment aspect of Title VII pregnancy-based discrimination is due to be granted.

### 2. *Disparate Impact*

■ Under the Pregnancy Discrimination Act of 1978, discrimination on the basis of pregnancy is discrimination on the basis of sex. Thus, the analysis applied to show discrimination on the basis of sex is applicable to the instant case. *Hayes v. Shelby Memorial Hosp.*, 726 F.2d 1543, 1547 (11th Cir.1984).

The plaintiff establishes a prima facie case on the basis of sex, where the claim is disparate impact, by showing:

(1) that defendant engaged in a specific employment practice that had an adverse impact on pregnant employees; and

(2) that there is a causal link between the challenged employment practice and the adverse impact. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 2788, 101 L.Ed.2d 827 (1988); *Kilgo v. Bowman Transport, Inc.*, 789 F.2d 859, 867–68 (11th Cir.1986).

To demonstrate an adverse impact, the plaintiff must show that a neutral standard impacts on pregnant women more harshly

---

**9.** A nurse could be excused from treatment of an AIDS patient where that nurse had open lesions and would be more likely to acquire the AIDS virus because of these lesions.

**10.** In fact, it is apparently the *lack* of disparate treatment because of plaintiff's pregnancy upon which plaintiff bases her claim.

than other classifications such as men or nonpregnant women. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). Defendant engaged in a neutral practice of requiring home care nurses to treat patients assigned to them or be fired. Plaintiff contends that this practice had an adverse impact on pregnant women because it poses a risk to the fetus—a risk which nonpregnant nurses do not have to face. Plaintiff further alleges that a pregnant woman is faced with "an odious choice—either face termination or expose her baby to a risk of death or birth defect." [11]

The plaintiff alleges that the defendant engaged in a specific employment practice that had an adverse impact on pregnant employees. The employment practice which the plaintiff contends had an adverse impact was the requirement that plaintiff treat AIDS patients as well as all other patients assigned to her as a home care nurse or face termination. In fact, the employment practice at issue is the defendant's policy that all nurses, pregnant and nonpregnant alike, treat all patients to whom they are assigned. The alleged impact is that to require this pregnant nurse to treat AIDS patients required her to expose herself and her fetus to risk of harm which would occur through the transmission of AIDS or an accompanying opportunistic infection. While this alleged impact is irrefutably adverse, the impact is not disparate with nonpregnant employees as to the risk to herself. The only disparity in the impact between pregnant and nonpregnant nurses is the potential risk of harm to the fetus. However, this risk of harm is omnipresent during the term of a pregnancy.

The adverse impact in the terms of Title VII then, is the termination of the plaintiff. The employment practice at issue is the defendant's policy that all nurses, pregnant and nonpregnant alike, treat all patients to whom they are assigned. The plaintiff must next demonstrate a causal link between the employment practice and the adverse impact in order to establish her prima facie case. Plaintiff claims that the impact was adverse, and causally linked to the employer's practice of requiring her to treat all patients assigned to her. The court agrees that the termination of the plaintiff was an adverse impact. However, the court disagrees that there is a causal link between the specific employment practice of treating all employees alike, and the termination of the plaintiff. No court has held that a causal link exists sufficient to satisfy plaintiff's prima facie case of disparate impact pregnancy discrimination where (1) the employer treats all employees in a similar fashion as required by PDA; (2) the plaintiff is physically capable of doing her job as required by the employer; and (3) the plaintiff is terminated from employment because she is unwilling to perform the duties of her job.

The court holds that the plaintiff has failed to establish a prima facie case of disparate impact in this matter. The defendant's employment practice of treating all employees equally conformed to the requirements of PDA. That employment practice did eventually lead to the adverse impact of plaintiff's termination. Nonetheless, there was a superseding, intervening cause which breaks the causal link between the employer practice and the plaintiff's termination. That intervening cause was the conscious decision of the plaintiff to refuse to do her job. It was not the act of the employer that was responsible for plaintiff's termination, but that of the plaintiff. Plaintiff was unwilling to perform the duties of her job. Therefore, she was terminated by the defendant. Nowhere in such circumstances is Title VII implicated. In fact, the Supreme Court has noted that the PDA was not intended to provide accommodations to pregnant employees when such accommodations rise to the level of preferential treatment [12]. The

---

**11.** Plaintiff's Brief in Opposition to Defendant's Motion for Partial Summary Judgment, p. 8.

**12.** *International Union, UAW v. Johnson Controls, Inc.,* —— U.S. ——, ——, 111 S.Ct. 1196,

1213, 113 L.Ed.2d 158 (1991) (concurring opinion of WHITE, J.) ("the purpose of the PDA was simply to make the treatment of pregnancy consistent with general Title VII principles." (cita-

Court held specifically that, in the context of action being taken by the employer, it is the woman's decision to make as to whether or not to subject the fetus to harm. *International Union, UAW v. Johnson Controls, Inc.*, — U.S. —, — 111 S.Ct. 1196, 1207, 113 L.Ed.2d 158 (1991). The employer cannot legally prohibit pregnant nurses from treating AIDS patients. However, the PDA does not require the employer to make accommodations to pregnant employees which amount to preferential treatment.[13]

To accept the plaintiff's argument that this situation should require an employer to make reasonable accommodations to the pregnant nurse is to require the employer to relinquish virtually all control over employees once they become pregnant[14]. The Pregnancy Discrimination Act was never intended to accomplish that end.

Therefore, the court today decides that Title VII does not apply to a situation where the employer treats pregnant and nonpregnant persons equally and there is no causal link between this equal treatment of employees and the defendant's termination. Thus, as a matter of law, the defendant's motion for summary judgment as it pertains to the Title VII claim of disparate impact is due to be granted.

### 3. *Retroactivity of the Civil Rights Act of 1991*

Because the court finds that Title VII does not apply to the facts of this case, based upon the finding that the plaintiff failed to establish a prima facie case of either disparate treatment or disparate impact, it is unnecessary to address the issue of the retroactivity of the Civil Rights Act of 1991 and its implications regarding the right to a jury trial and damages.

### B. Fraudulent Misrepresentation Claim

In order to establish a prima facie case of fraudulent misrepresentation, a plaintiff must show that the defendant made (1) a false representation; (2) of a material existing fact; (3) that the plaintiff justifiably relied on; and (4) that the plaintiff was damaged as a proximate result. *Allstate Ins. Co. v. Hilley*, 595 So.2d 873, 875 (Ala.1992). In order to further establish a prima facie case of fraudulent misrepresentation where the misrepresentation was based upon a promise to take some future action, two additional elements are required. These elements are that "... (1) the promisor at the time of the alleged misrepresentation, did not intend to do the act promised; and (2) that the promisor, at that time, had an intent to deceive." *General Motors Acceptance Corp. v. Covington*, 586 So.2d 178, 181 (Ala.1991) (citations omitted). All six elements must be shown by substantial evidence in order to overcome a motion for summary judgment. *Weller v. Riverchase Center Assoc.*, 597 So.2d 206, 208, n. 1 (Ala.1992).

Defendant alleges that this claim clearly involves a promise to do some future act, and that plaintiff cannot demonstrate any

---

tion omitted)); *California Federal S. & L. Assn. v. Guerra*, 479 U.S. 272, 286, 107 S.Ct. 683, 692, 93 L.Ed.2d 613 (1987) ("In contrast to the thorough account of discrimination against pregnant workers, the legislative history is devoid of any discussion of preferential treatment of pregnancy, beyond acknowledgments of the existence of state statutes providing for such preferential treatment....").

**13.** *Johnson Controls, Inc.*, — U.S. at —, 111 S.Ct. at 1209 (Congress considered at length the considerable cost of providing equal treatment of pregnancy and related conditions, but made the "decision to forbid special treatment of pregnancy despite the social costs associated therewith."); *See also Arizona Governing Committee v. Norris*, 463 U.S. 1073, 1084, n. 14, 103 S.Ct. 3492, 3499, n. 14, 77 L.Ed.2d 1236 (1983) (opin-

ion of MARSHALL, J.); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1988).

**14.** The defense suggests that to rule in plaintiff's favor here would be logically consistent with a ruling that a pregnant emergency room nurse could refuse to care for a potentially violent patient because of the risk that the patient may become combative and kick or strike her in the stomach which may cause injury to her fetus.

Another example cited by the defense would require employers to accommodate a request by a pregnant employee who is required to walk up and down steps based upon the risk that if she were to stumble, her fetus may be harmed.

The PDA was not intended to extend to such subjective fears. Rather, it was intended to extend to actions of the employer.

evidence of a present intent to not purchase the scholarship, or a present intent to deceive plaintiff.

Plaintiff maintains that this claim does not involve a promise to do some future act. Plaintiff states that the agreement to purchase the scholarship existed at the time of, and as a condition of plaintiff's decision to accept defendant's offer of employment. Plaintiff relies on the statements allegedly made by Cheryl Wynn. In determining whether to grant summary judgment, the court looks at the facts in the light most favorable to the non-moving party; in this case the plaintiff.

 Viewing the facts in the light most favorable to the plaintiff, it does appear that an agreement existed between plaintiff and defendant, whereby defendant agreed to purchase plaintiff's scholarship as a condition of employment. However, such an agreement would constitute a promise to act in the future. Therefore, the alleged fraud would constitute a promissory fraud and the two additional elements would be necessary for plaintiff to establish a prima facie case of fraud.

"The failure to perform a promised act is not in itself evidence of intent to deceive at the time a promise is made ... If it were, the mere breach of a contract would be tantamount to fraud." *Russellville Prod. Credit Assn. v. Frost*, 484 So.2d 1084, 1086 (Ala.1986) (citation omitted). Absent direct evidence of a present intent not to perform a future act, a party may offer circumstantial evidence such that reasonable jurors may "fairly and reasonably infer" such a present intent. *Id.*

The only circumstantial evidence plaintiff can show is that it appears that Cheryl Wynn understood there to be an agreement between the plaintiff and the defendant. Plaintiff has not provided any evidence supporting the premise that Donna McPherson deceived Cheryl Wynn into believing an agreement existed so that Wynn could relay this information to the plaintiff. In fact, defendant has agreed to purchase similar contracts and scholarships from nurses both before and since this alleged incident.

Thus, viewing the evidence in the light most favorable to the plaintiff, she cannot establish by substantial evidence that the defendant or its employees had a present intent not to perform the contract. Furthermore, plaintiff would be unable to show, by substantial evidence, an intent on the part of the defendant or its employees to deceive the plaintiff. The record simply offers no evidence of such an intent.

Therefore, the defendant's motion for summary judgment as it pertains to plaintiff's claim of fraudulent misrepresentation is due to be granted.

## IV. CONCLUSION

For the aforementioned reasons, the defendant's motion for partial summary judgment, as it applies to both the Title VII issue and the claim of fraudulent misrepresentation is due to be and is hereby GRANTED. Summary judgment is entered in favor of the defendant on Counts I, II, and III of the complaint as amended.