Pam ARMSTRONG, Plaintiff–Appellant,

v.

FLOWERS HOSPITAL,
INCORPORATED, Defendant–Appellee.

No. 93–6502.

United States Court of Appeals,
Eleventh Circuit.

Oct. 3, 1994.

Truman H. Hobbs, Jr., Copeland, Franco, Screws & Gill, Montgomery, AL, for appellant.

L. Traywick Duffie, Terri L. Rosen, Hunton & Williams, Atlanta, GA, for appellee.

Before ANDERSON and BIRCH, Circuit Judges, and CONWAY*, District Judge.

CONWAY, District Judge:

In January 1992, Pamela Armstrong filed suit against Flowers Hospital, Inc. alleging a violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–2(a)(1) and (2), as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k). Armstrong's complaint also asserted claims of fraudulent misrepresentation and breach of contract. The district court granted summary judgment in favor of Flowers Hospital on Armstrong's claim of disparate treatment and disparate impact under Title VII, and on her claim of fraudulent misrepresentation. *Armstrong v. Flowers Hosp., Inc.,* 812 F.Supp. 1183 (M.D.Ala.1993). The parties then settled the breach of contract issue, and this appeal followed. For the reasons stated below, we affirm.

* Honorable Anne Callaghan Conway, U.S. District Judge for the Middle District of Florida, sitting

## I. STANDARD OF REVIEW

We review a grant of summary judgment *de novo,* applying the same legal standard employed by the district court. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir.1993). A motion for summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion and the absence of a genuine issue of material fact. *Hairston,* 9 F.3d at 918. In determining whether this burden has been met, the district court must review the evidence and all factual inferences drawn from that evidence in the light most favorable to the non-moving party. *Id.* If this initial burden is met, the burden shifts to the non-moving party to establish that there exist genuine issues of material fact. *Id.*

## II. FACTS

In June 1989, Armstrong received an associate's degree in nursing from Wallace College in Dothan, Alabama. Following her graduation, she was employed as a nurse in the newborn nursery of Southeast Alabama Medical Center ("SAMC"). After one year with SAMC, Armstrong concluded that her evening shift at SAMC made it difficult to meet her family's needs, and she decided to look for a day job. She responded to an advertisement for a position in the Home Care Services division ("HCS") of Flowers Hospital. Shortly after an interview with Cheryl Wynn, the administrator of the Dothan, Alabama office of HCS, Armstrong accepted a position as a home health care nurse, based in the Dothan office. As part of the terms of her employment, Armstrong understood that her SAMC student loan would be repaid by Flowers Hospital.

by designation.

Armstrong began her new position in early August 1990. During orientation, she read the HCS policy and procedure manual and also reviewed a handbook on universal precautions.[1] At the end of her orientation, Armstrong assumed responsibility for approximately 25 patients. She periodically visited these patients in their homes and provided whatever nursing services were required.

On Wednesday, December 12, 1990, Mary O'Connell, the HCS admissions nurse, informed Armstrong that, beginning on Friday, December 14, a new patient would be assigned to her. The patient was HIV-positive and had been diagnosed with cryptococcal meningitis. Armstrong understood that the patient had problems with nausea and vomiting and that his medical needs would require her to provide nursing care for four hours each day.[2] Additionally, she understood that it would be necessary for her to draw his blood for lab work. O'Connell explained that special bags would be provided for contaminated materials, and Sharps containers would be available for used needles.

The addition of an HIV positive patient to her schedule caused Armstrong considerable alarm.[3] She had recently learned that she was pregnant, and her primary concern was that caring for an HIV-positive patient would put her fetus at risk. The HIV-virus causes a patient to be more susceptible to various opportunistic diseases.[4] According to Armstrong, it was the risk of these opportunistic diseases and their potential effect on her fetus that made her apprehensive. Her concern was heightened by two factors. First, she was in her first trimester of pregnancy and believed that her fetus was more vulnerable during this period. Second, she had gestational diabetes, which is a form of diabetes that occurs only during pregnancy and which can weaken a woman's immune system.

After some discussion, Armstrong stated that, because of her pregnancy, she "did not need" to see this new patient. R.19, Deposition of Pam Armstrong, dated March 26, 1992 (hereinafter, "Armstrong"), at 55. O'Connell told her to discuss the matter with Cheryl Wynn, who had made the initial patient assignment. Before calling Wynn, Armstrong consulted her nursing textbooks and called her sister and a friend, both of whom are nurses. Based on the advice she received and on the material in her textbooks, she concluded that she should not treat an HIV-positive patient.

Wynn and Armstrong discussed the patient assignment later that evening. The parties agree that Armstrong voiced her concerns about seeing an HIV-positive patient during the first trimester of her pregnancy. The parties also agree that Wynn reviewed the HCS policy regarding patient treatment. That policy provided that refusal to treat a patient was grounds for termination. Wynn also indicated that Armstrong was given this patient assignment because she was in the best position to handle the time required.

Several aspects of the Wednesday evening conversation are in dispute.[5] Armstrong asserts that she discussed her gestational diabetes with Wynn.[6] Armstrong at 68. Wynn does not recall being told about gestational diabetes. R.19, Deposition of Cheryl Wynn, dated March 27, 1992 (hereinafter "Wynn"), at 70. Wynn claims that she offered to provide any equipment that Armstrong be-

1. As Armstrong understands the term, "universal precautions" are infection control procedures which are to be implemented by a nurse when the nurse is uncertain whether a patient is infectious. In effect, the nurse is to assume that a patient is infectious until it is established that such is not the case. R. 19, Deposition of Pam Armstrong, dated March 26, 1992, at 25.

2. Care for this patient actually required two different half hour visits, four hours apart, on a daily basis. R. 19, Deposition of Cheryl Wynn, dated March 27, 1992, at 97.

3. Armstrong had not knowingly treated an HIV-positive patient in the year she worked at SAMC or in the course of her work at HCS.

4. Cryptococcal meningitis, the disease for which the new HIV-positive patient was to be treated, is one such opportunistic disease.

5. None of these disputed facts are material to the legal issues involved in this case.

6. In fact, Armstrong maintains that she discussed her gestational diabetes with Wynn on a number of occasions. Armstrong at 190.

lieved she needed to work with the HIV-positive patient. Wynn at 57. Armstrong denies this offer was made. Armstrong at 108. At the end of the conversation, Armstrong understood that Wynn would consider the possibility of reassigning this patient to another nurse in order to accommodate Armstrong's concerns. Armstrong at 72. Wynn did, in fact, arrange for another nurse to see the HIV-positive patient. However, this schedule change was made simply in anticipation of Armstrong's refusal to treat him. Wynn at 60.

Immediately after this conversation, Wynn discussed the situation with her supervisor, Donna McPherson, who was the director of clinical services for HCS. Wynn and McPherson have stated that they did not understand why Armstrong would refuse to see an HIV-positive patient. At no time did they consider modifying the HCS policy requiring nurses to treat all patients.

Flowers Hospital has noted that between Wednesday evening and Friday, Armstrong did not take certain steps. She did not inquire more closely into the nature of the nursing services the HIV-positive patient required. Nor did she inquire into the availability of masks, gloves, gowns or other items that could decrease the risk of infection. She did not talk to a physician or her obstetrician-gynecologist. She did not obtain a statement from her physician indicating that she had gestational diabetes. This lack of initiative is explained to some extent by her view of the risks involved in working with HIV-positive patients. Armstrong was convinced that universal precautions, even if properly executed, would not provide sufficient protection. Accordingly, she decided that she would not treat the patient. Armstrong at 95.

On Friday, December 14, Wynn confirmed that Armstrong would not treat the HIV-positive patient. Armstrong then chose to be terminated, rather than to resign.

Prior to Armstrong's termination, another HCS nurse refused to treat an HIV-positive patient. In that case, the nurse was not

pregnant. After considering the situation for two or three days, the nurse remained firm in her refusal to treat the patient, and then chose to resign rather than be terminated. According to McPherson, these are the only instances in which a nurse in any of the HCS offices has refused to treat a patient.

At her deposition, Wynn testified that she knew of six nurses who became pregnant while working at HCS. Three of those nurses became pregnant after Armstrong was . terminated. All three treated AIDS patients after they became pregnant.[7] Wynn at 102.

A single policy and procedure manual contains the written policy statements for Flowers Hospital and HCS. However, as Wynn and McPherson have noted, many of the policies are applicable only to Flowers Hospital. If the administrators at HCS determine they need to create a policy in order to address a situation, they turn to hospital staff members for guidance. They do not, however, simply adopt existing hospital policies. Instead, they assess the suitability of a given hospital policy to the home health care setting. In the end, HCS administrators may adopt the hospital's policy or, instead, draft a revised policy to meet their own needs.

Only one of the HCS policies in the manual is relevant to this case. That policy, entitled "AIDS–Universal Precautions," has an effective date of September 9, 1988. R.25, Exhibit 6. The policy includes guidelines to be used in the care of *all* patients. One of the guidelines provides that "[h]ealth care workers who have exudative (oozing) lesions or weeping dermatitis (inflammation of the skin) should refrain from all direct patient care and from handling patient-care equipment until the condition resolves." Another guideline provides that "[p]regnant healthcare workers should be especially familiar with precautions to minimize the risk of HIV transmission and should strictly adhere to such precautions."

Flowers Hospital's "AIDS–Universal Precautions" policy is exactly the same. In addi-

7. From the record, it is not clear whether these patients were HIV-positive or, instead, whether

the virus had developed into AIDS.

tion, Flowers Hospital has a number of written policies that have not been adopted by HCS. Armstrong suggests that the following excerpted statements from those policies are relevant to this case:

1. *Hemodialysis Infection Control:* "Nurses who are pregnant are not allowed to care for HAA+ [8] patients." The effective date of the policy is March 20, 1990. R.25, Exhibit 4.

2. *Herpes Exposure:* "Women employees who are pregnant should not work in a patient's room who is known to have *active* herpetic lesions." The effective date of the policy is February 1, 1983. The policy was revised on May 16, 1990 and reviewed in 1991 and 1992. R.25, Exhibit 5.

3. *Summary of Nursing Care for Patient Receiving Radioactive Ir–192 Bronchial or Interstitial Irradiation:* "No pregnant lady or persons under 18 are allowed." The effective date of the policy is July 10, 1991.

In addition to these written policies, Armstrong asserts that the hospital has an unwritten policy related to work assignments for pregnant nurses. On the day after her termination, Armstrong contacted Janie Powell, a nursing supervisor at Flowers Hospital. Armstrong represented that she was working at HCS and was thinking of applying for a nursing position at the hospital. She asked Powell to explain the hospital policy regarding pregnant nurses working with isolation patients. Powell indicated that there was no written policy on this matter, but that isolation patients were assigned to non-pregnant nurses.[9] Armstrong then contacted an infection control nurse at the hospital. In response to the same question, the nurse stated that, if possible, they assigned the patient in isolation to a non-pregnant nurse.

Approximately four months after she was terminated, Armstrong learned that Flowers Hospital had not assumed her SAMC student loan. Upon inquiry, Armstrong discovered that none of the required paperwork had been completed.

## III. PROCEDURAL HISTORY

The trial court set September 15, 1992, as the deadline for discovery. On that same day, Flowers Hospital filed its motion for partial summary judgment. Armstrong responded to the motion, and the district court permitted both parties to file replies. The district court then granted the motion for partial summary judgment on Armstrong's discrimination and fraudulent misrepresentation claims. Armstrong appeals the trial court's decision on both claims.

## IV. DISCUSSION

### A. Title VII Claims

In 1978, Congress amended Title VII by enacting the PDA, which provides, in relevant part:

The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work. . . .

42 U.S.C.A. § 2000e(k) (1981). Rather than introducing new substantive provisions protecting the rights of pregnant women, the PDA brought discrimination on the basis of pregnancy within the existing statutory framework prohibiting sex-based discrimination. Section 703 of Title VII, which provides the substantive rule regarding sex-based employment discrimination, applies with equal force to employment discrimination on the basis of pregnancy.[10] The analy-

---

8. The parties agree that HAA+ is the same as Hepatitis B.

9. Armstrong perceived this policy to be consistent with the policy she had observed while working in the nursery at SAMC.

10. Section 703 of Title VII provides:
   (a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

sis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits. *Maddox v. Grandview Care Center, Inc.,* 780 F.2d 987, 989 (11th Cir.1986).

There are two types of discrimination actionable under Title VII. The first is "disparate treatment," or intentional discrimination. The Supreme Court has provided the following explanation of disparate treatment:

> The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

*Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396, 415 n. 15 (1977) (citations omitted). This court has further identified two separate theories of disparate treatment. *Maddox v. Grandview Care Center,* 780 F.2d 987, 990 (11th Cir. 1986). The first theory involves "facial" discrimination. Facial discrimination occurs when an employer adopts a policy that explicitly treats some employees differently from others on the basis of race, religion, national origin, or gender (pregnancy). The second theory of disparate treatment applies to an employment policy, which, although neutral on its face, is allegedly a "pretext" for discrimination prohibited by Title VII.

The second type of discrimination prohibited by Title VII is "disparate impact." The Supreme Court explains disparate impact as follows:

> [Claims of disparate impact] involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discrimina-

ry motive, we have held, is not required under a disparate impact theory.

*Int'l Brotherhood of Teamsters v. United States,* 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854–55 n. 15, 52 L.Ed.2d at 415 n. 15 (1977) (citations omitted). Although a plaintiff must establish intentional discrimination to prevail on a claim of disparate treatment, a claim of disparate impact may succeed without any evidence whatsoever of intentional discrimination.

HCS requires each and every nurse to treat the patients assigned to that nurse. A nurse who refuses to treat a patient may be terminated. It is this employment practice that Armstrong challenges as discriminatory. Since the policy is neutral on its face (*i.e.,* it does not by its terms apply exclusively to a protected group), a claim of disparate treatment based on facial discrimination cannot be maintained. However, a facially neutral policy may be challenged by either a claim of disparate treatment based on a pretext theory or a claim of disparate impact. Armstrong argues that application of each of these theories to the facts of the case reveals that the HCS policy is discriminatory.

### 1. Disparate Treatment

A plaintiff alleging a claim of disparate treatment must establish that the employer intended to discriminate against the protected group. If direct evidence of discriminatory intent is not available, a plaintiff may present circumstantial evidence from which an inference of intentional discrimination may be drawn. *Troupe v. May Dep't. Stores Co.,* 20 F.3d 734 (7th Cir.1994). The first step in a claim of disparate treatment, based on a theory of "pretext" and supported by circumstantial evidence, is for the plaintiff to establish a *prima facie* case which creates a rebuttable presumption of unlawful discrimination. The defendant may rebut this presumption, if made, by articulating a nondiscriminatory reason for its actions. To prevail, the plaintiff must show that the non-

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way

which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C.A. § 2000e–2(a) (1981).

discriminatory reason offered by the defendant is a pretext for discrimination. *Maddox*, 780 F.2d at 990.

■ The elements of a plaintiff's *prima facie* case were established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and then refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Courts have modified the *McDonnell Douglas/Burdine* formulation as necessary to facilitate analysis in a wide range of discrimination claims. The district court in the case at hand properly applied the following formulation of the elements required to establish a *prima facie* case: (1) the plaintiff is a member of a group protected by Title VII; (2) the plaintiff was qualified for the position; (3) the plaintiff suffered an adverse effect on her employment; and (4) the plaintiff suffered from differential application of work or disciplinary rules. *Armstrong v. Flowers Hosp., Inc.*, 812 F.Supp. 1183, 1189 (M.D.Ala.1993).

The fourth element is critical to Armstrong's claim. The HCS policy she challenges has been applied in exactly the same way to pregnant and non-pregnant employees. To establish differential application of work or disciplinary rules, then, Armstrong compares the policies in effect at Flowers Hospital with the policies in effect at HCS.[11] This comparison reveals that there are circumstances in which pregnant employees at Flowers Hospital do not have to treat certain patients. Armstrong argues that this differential treatment between Flowers Hospital and HCS satisfies the fourth element of her *prima facie* case.

The comparison Armstrong advances leads to a conclusion that different work rules are in effect. The different rules address different concerns and situations. These differences do not represent differential application of a rule. Armstrong has not established that her patient had herpes or hepatitis B or that any type of radiation was involved. The Flowers Hospital policies on those conditions are inapplicable to this case.

Even assuming that pregnant nurses in Flowers Hospital are not assigned to work with some or all isolation patients, Armstrong has not established that the patient at issue would have been placed in isolation if he were in Flowers Hospital. Armstrong has *not* established that a pregnant nurse in Flowers Hospital may refuse to see an HIV-positive patient and demand an alternate assignment. She also has not established that a pregnant nurse at Flowers Hospital may refuse to see a patient for reasons other than those set forth above (none of which are applicable to Armstrong's situation) without being terminated.

Armstrong has failed to establish differential application of work and disciplinary rules. Hence, she has failed to establish a *prima facie* case of disparate treatment.

### 2. Disparate Impact

■ To establish a *prima facie* case of disparate impact, a plaintiff must first identify the specific employment practice that allegedly has a disproportionate impact. *Watson v. Ft. Worth Bank and Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 2788, 101 L.Ed.2d 827, 845 (1988) (addressing a claim of racial discrimination in promotion). Next, the plaintiff must establish causation by offering statistical evidence sufficient to show that the practice in question has resulted in prohibited discrimination. *Id.*

■ Since a plaintiff need not establish intentional discrimination, the analysis in cases alleging disparate impact involves different issues of fact and types of evidence than the analysis required in disparate treatment cases. *Id.* at 987, 108 S.Ct. at 2785, 101 L.Ed.2d at 840. Disparate impact cases typically focus on statistical disparities and on the various explanations for those disparities, rather than on specific incidents. *Id.* The statistical disparities must be "sufficiently substantial that they raise [ ] an inference of causation." *Id.* at 995, 108 S.Ct. at 2789, 101

---

11. Flowers Hospital contends that the hospital and HCS are separate entities, and that a comparison between the two is not reasonable. For the purposes of addressing Armstrong's argument, we assume that the comparison she has made is a valid one.

L.Ed.2d at 845. *Accord Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). In the end, a defendant may not be held liable on a claim of disparate impact on the basis of less evidence than is required to prove intentional discrimination. *Watson,* 487 U.S. at 987, 108 S.Ct. at 2785, 101 L.Ed.2d at 840.

Armstrong challenges the HCS policy requiring nurses to treat without exception those patients to whom they are assigned. She has, therefore, satisfied the first element of her *prima facie* case. The consequence, or impact, of this policy is termination of nurses who refuse to put themselves or their fetuses at risk by treating certain patients. To satisfy the second element of her *prima facie* case, Armstrong must produce competent evidence which shows that this adverse impact, termination, falls disproportionately on pregnant employees. It is the second element that Armstrong cannot establish. Only two employees have resigned or been terminated under the HCS policy at issue. Armstrong is one of the two. The other was a non-pregnant nurse who also refused to see an HIV-positive patient. No other evidence related to termination has been produced. On this evidence, it appears the policy does not have a disproportionate impact on pregnant employees.

It appears Armstrong recognized the futility of advancing a disparate impact argument with termination as the underlying adverse impact. Instead, she has argued both in the district court and on appeal that the adverse impact implicated in her claim is the difficult choice forced on a pregnant employee who is confronted with the inflexible policy HCS enforces. According to Armstrong, the policy requires a woman to choose between her job and the health of her fetus. Brief of Appellant at 8. It is this adverse impact that falls more harshly on pregnant employees.

In support of her "difficult choice" disparate impact argument, Armstrong asserts

that "[r]ecent Supreme Court decisions have stressed that an employer cannot force a pregnant woman into choosing between her job and the health of her fetus." *Id.* It appears Armstrong misapprehends the Supreme Court holding in *International Union, UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). The Supreme Court did state that "women as capable of doing their jobs as their male counterparts may not be forced to choose between having a child and having a job." *Id.* at 204, 111 S.Ct. at 1206, 113 L.Ed.2d at 177. However, this statement must be taken in the context of the facts of *Johnson Controls.* In that case, the employer had denied women who were capable of becoming pregnant the opportunity to work in certain jobs. A comparable situation would exist if HCS had denied Armstrong the right to work in home health care solely because she was pregnant. Armstrong would then be forced to choose between having a child and having a job. Such is not the situation in this case.

Instead of permitting an employer to decide whether a pregnant woman can assume or continue a particular job, the Supreme Court concluded that this type of decision must be left to the pregnant woman. *Id.* at 206, 111 S.Ct. at 1207, 113 L.Ed.2d at 178. "With the PDA, Congress made clear that the decision to become pregnant or to work while being either pregnant or capable of becoming pregnant was reserved for each individual woman to make for herself." *Id.* The right to make this decision rests with the woman. She may choose to continue working, to seek a work situation with less stringent requirements, or to leave the workforce. In some cases, these alternatives may, indeed, present a difficult choice. But it is a choice that each woman must make.

According to the deposition testimony of Armstrong's expert witness, a pregnant employee is more susceptible to contagious diseases.[12] There also exists a risk that contagious diseases communicated to the mother

---

12. It is the expert's opinion that this increased susceptibility exists even if the pregnant employ-

ee does not have gestational diabetes.

will harm the fetus. However, Plaintiff has not presented evidence that these increased risks are comparable to any risk for which HCS or Flowers Hospital made accommodation. Based on the facts of this case, a pregnant employee, concerned about these increased risks yet still able to continue work, is faced with a difficult choice. It is precisely this choice, however difficult, that is reserved to the pregnant employee under the PDA and *Johnson Controls.*

■ Armstrong has asserted that an employer must ease the decision-making process by making alternative work available for a pregnant employee. *Johnson Controls* does not support such an assertion. An employer is generally prohibited from deciding for a pregnant employee what course of action is best for her. This prohibition does not constitute a requirement that an employer make alternative work available.

Throughout this case, Flowers Hospital has asserted that Plaintiff's claims of discrimination are more accurately viewed as an effort to secure preferential treatment for pregnant employees. The preferential treatment would consist of accommodation of a pregnant employee's concerns regarding risk to herself and her fetus through rescheduling of nursing assignments. In other words, a pregnant employee would be entitled to refuse to work on a given patient if she believed the patient posed a special risk to herself and her fetus, while a non-pregnant employee would have no right to refuse to perform a particular assignment. Flowers Hospital argues that preferential treatment is not required by the PDA. The hospital draws support for its argument from the language of the PDA, its legislative history and caselaw interpreting and applying the statute.

The PDA provides that pregnant employees "shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work." 42 U.S.C.A. § 2000e(k). To the extent that a pregnant employee is able and willing to work, in spite of her concerns regarding risk to the fetus, the PDA protects her right to remain in the work place. The language of the statute simply does not address the right of a pregnant employee, fully able to work, to receive benefits that are different from, and arguably superior to, the benefits available to other employees.

The legislative history of the PDA has been reviewed in some detail by the Supreme Court. This history confirms that the statutory standard of the PDA was "chosen to protect female workers from being treated differently from other employees simply because of their capacity to bear children." *Johnson Controls*, 499 U.S. at 205, 111 S.Ct. at 1206, 113 L.Ed.2d at 177 (1991).

> Under this bill, the treatment of pregnant women in covered employment must focus not on their condition alone but on the actual effects of that condition on their ability to work. Pregnant women who are able to work must be permitted to work on the same conditions as other employees; and when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working.

*Carney v. Martin Luther Home, Inc.,* 824 F.2d 643, 646 (8th Cir.1987) (quoting S.Rep. No. 95–331, 95th Cong., 1st Sess. 3–4 (1977)).

Insight into the type of protection afforded by the PDA may also be gleaned from relevant caselaw. The court in *Carney* identified two purposes underlying the PDA: 1) to require employers who provide disability benefits to their employees to extend those benefits to women who are unable to work due to pregnancy-related conditions, and 2) to prevent differential treatment of women in all aspects of employment based on the condition of pregnancy. *Id.* In some instances, differential treatment has been based on a professed concern for the well-being of pregnant women and the fetus. *Id.* at 649. Some "protective" laws and policies have "perpetuated women's second class status in the work place." *Id.* at 647.

Both legislative history and relevant case-law support a conclusion that Congress intended the PDA to end discrimination against pregnant employees. By contrast, except for brief references to certain state statutes, the legislative history contains no discussion of preferential treatment based on pregnancy. *Cal. Fed. Sav. and Loan Ass'n v. Guerra,* 479 U.S. 272, 286, 107 S.Ct. 683, 692, 93 L.Ed.2d 613, 627 (1987). The Supreme Court has held that the PDA does not prohibit preferential treatment.[13] *Id.* at 286–88, 107 S.Ct. at 692–93, 93 L.Ed.2d at 627–28. However, permitting preferential treatment and requiring preferential treatment are entirely different matters. Statements in the legislative history make it clear that the PDA does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees. *Id.* at 286, 107 S.Ct. at 692, 93 L.Ed.2d at 627.

A number of courts have either explicitly or implicitly recognized that the PDA imposes no such requirement on employers. In *Troupe v. May Dep't Stores Co.,* 20 F.3d 734 (7th Cir.1994), the court addressed the claim of an employee who was terminated immediately before her maternity leave was to begin. The employee was repeatedly tardy due to severe morning sickness. The court observed that the plaintiff had "rightly not argued" that the PDA requires "an employer to treat an employee afflicted by morning sickness better than the employer would treat an employee who was equally tardy for some other health reason." *Id.* at 737. While the PDA requires the employer to ignore the pregnancy, the employer need not ignore absences, unless the employer likewise ignores the absences of nonpregnant employees. "The [PDA] does not, despite the urgings of feminist scholars, require employers to offer maternity leave or take other steps to make it easier for pregnant women to work—to make it as easy, say, as it is for their spouses to continue working during

pregnancy." *Id.* at 738. The court went on to note that "disparate impact as a theory of liability is a means of dealing with the residue of past discrimination, rather than a warrant for favoritism." *Id. See also Barrash v. Bowen,* 846 F.2d 927 (4th Cir.1988) (employee who sought six month maternity leave not entitled to dictate managerial decisions affecting employment relationship); *Sussman v. Salem, Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 693 (M.D.Fla.1994) ("To require an employer to make reasonable accommodations for a pregnant employee is to require the employer to relinquish virtually all control over employees once they do become pregnant."); *Elie v. K–Mart Corp.,* 64 Fair Empl.Prac.Cas. (BNA) 957, 1994 WL 50250 (E.D.La.1994) (employer not required to provide pregnant employee with light duty assignment of her choice). As the Seventh Circuit observed in *Troupe,* "[e]mployers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees...." *Troupe,* 20 F.3d at 738. Title VII simply does not require employers to treat their employees with kindness. *Ulloa v. Am. Express Travel Related Servs. Co.,* 822 F.Supp. 1566, 1571 (S.D.Fla.1993).

Armstrong has not provided evidence sufficient to establish a *prima facie* case of discrimination. It may be that an evidentiary basis for discrimination cannot be established because the policy modification Armstrong seeks is, in reality, a form of preferential treatment. We need not speculate on this matter. Armstrong's discrimination claims fail for lack of evidence.

### B. Fraudulent Misrepresentation

Armstrong alleged that Flowers Hospital fraudulently misrepresented a willingness to assume her student loan. Review of the record reveals no evidence of intent to deceive Armstrong or a present intent not to pay off the student loan balance at the time

---

**13.** Justice Marshall, in a concurring opinion, conceded that the PDA does allow some preferential treatment of pregnancy. However, he noted that not all preferential treatment is automatically beyond the scope of the PDA. *Guerra,* 479

U.S. at 294 & n. 3, 107 S.Ct. at 696 & n. 3, 93 L.Ed.2d at 632 & n. 3. Justice White, writing for the dissent, found that the PDA prohibits preferential treatment. *Id.* at 304, 107 S.Ct. at 702, 93 L.Ed.2d at 638.

Armstrong was hired. No duty to disclose on the part of the hospital has been established. Moreover, there is no evidence to establish that Wynn willfully suppressed information concerning the student loan. Accordingly, Armstrong has failed to establish evidence sufficient to support her claim of fraudulent misrepresentation.

## V. CONCLUSION

Based on the foregoing, the judgment of the district court is AFFIRMED.

ANDERSON, Circuit Judge, concurring specially:

With respect to Armstrong's Title VII claims, I have concluded for somewhat different reasons that the judgment of the district court granting summary judgment to Flowers Hospital should be affirmed. My review of the record persuades me that Armstrong has not established either differential treatment or disparate impact. Armstrong has pointed to several policies of the hospital to support an argument in that the Hospital makes accommodation for risks comparable to the risks Armstrong, as a pregnant woman, faces in treating AIDS patients. Several of the policies to which Armstrong points do make accommodations for pregnant women. However, such policies could not constitute evidence of discrimination on account of pregnancy because those policies benefit pregnant employees. In other words, it cannot be discrimination on account of pregnancy to make accommodations for some risks faced by pregnant women, but not all. The only other policy which Armstrong suggests is comparable is the policy that employees with open lesions are not required to attend AIDS patients. However, my examination of this summary judgment record reveals that Armstrong has failed to create a material factual issue as to whether the risk which she faces is comparable to the risk faced by an employee with open lesions. Thus, Armstrong has failed to establish a genuine issue of material fact, either as to differential treatment or as to disparate impact. I also agree with Judge Conway that the law does not require preferential treatment.