Jeannie **FERRELL**, Plaintiff,

v.

**MASLAND CARPETS, INC., and The Dixie Group, Inc., Defendants.**

No. CIV.A. 99–0134–RV–S.

United States District Court,
S.D. Alabama,
Southern Division.

April 17, 2000.

Henry Brewster, Mobile, AL, Sherrie McKenzie, Monroeville, AL, for Plaintiff.

Paul D. Myrick, Mobile, AL, Lovic A. Brooks, Columbia, SC, for Defendants.

### OPINION

VOLLMER, District Judge.

Plaintiff Jeannie Ferrell brings this action against defendants Masland Carpets, Inc., and the Dixie Group, Inc. (collectively, "Masland") pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), and the Civil Rights Act of 1991. Ferrell asserts that her pregnancy was a motivating factor in Masland's

decision to terminate her employment. Masland denies that Ferrell's pregnancy played any part in her discharge. Rather, it asserts that Ferrell was terminated because she failed to achieve the required level of production during her ninety-day probationary period.

Masland now moves for summary judgment on the grounds that Ferrell has failed to offer any direct or circumstantial evidence to demonstrate that she was fired because of her pregnancy. In the alternative, Masland argues that even if Ferrell has established a *prima facie* case, she has not produced any evidence which shows that Masland's legitimate, non-discriminatory reason for discharging her was a pretext for pregnancy discrimination.

After carefully reviewing the law and considering the submissions of the parties,[1] the court concludes that there are no genuine issues of material fact and that Masland is entitled to judgment as a matter of law. Accordingly, Masland's motion for summary judgment will be granted.

## I. BACKGROUND

Masland manufactures custom-made carpet for commercial and residential customers. On February 23, 1998, Masland hired Ferrell to work as a reel operator or "reeler," a job that entails processing large quantities of carpet yarn on a reel machine. Operating a reel machine is a continuous process. The reeler places large spools of yarn on the machine, which then spins and sorts the yarn into smaller bundles called "skiens." Each skein weighs six pounds, and each machine cycle produces six skeins. When the cycle is complete, the reeler removes the skeins from the machine and loads the skeins onto a buggy. When the buggy is full (approximately 300 skeins), a material handler replaces it with an empty buggy and takes

---

1. The court has considered Masland's "Motion for Summary Judgment" (Doc. 22); Masland's "Brief in Support of Motion for Summary Judgment" (Doc. 23); Masland's proposed "Determination of Uncontroverted Facts and Conclusions of Law" (Doc. Prop.F/F); Ferrell's "Brief in Response to Defendant's Motion for Summary Judgment" (Doc. 27); and Masland's "Reply to Plaintiff's Opposition to Summary Judgment" (Doc. 30).

the loaded buggy to the dye department. There are two work stations at each reel machine, and one reeler works at each station. Although the two reelers work independently, they generally load their skeins into the same buggy.

Because a reeler's success in performing the job is primarily determined by the quantity of yarn that is produced, each reeler keeps a running tally of the number of skeins that he or she produces per shift. At the conclusion of the shift, the reeler converts this production total into pounds of yarn by multiplying the number of skeins by six pounds (*i.e.*, the weight of a single skein). The reeler then completes a daily production report reflecting the total production time and total pounds of yarn produced during that shift. After receiving this report from the reelers, the shift supervisor inputs the data into a computer. The supervisors at Masland regularly obtain weekly production reports from the computer and utilize these reports to evaluate each reeler's productivity.

All newly-hired reelers must complete a ninety-day probationary period in order to be retained as a regular employee.[2] Probationary reelers are evaluated in several performance areas; however, they must regularly produce at least 200 pounds of yarn per hour each day, which is the equivalent of approximately 270 skiens per day, to successfully complete probation. Although Masland considers a probationary reeler's average hourly production over the course of the entire ninety-day probationary period, the determining factor is whether the reeler regularly produces at least 200 pounds of yarn per hour during the last twenty to thirty days of probation. If a probationary reeler does not achieve this required production standard, or if the reeler's job performance is unsatisfactory for other reasons, the reeler is not retained as a regular employee. In fact, since Masland began its reeling operation several years ago, not one probationary reeler who has failed to achieve the required production standard during probation has been retained as a regular employee.

For instance, during Ferrell's probationary period, twelve other reelers were in various stages of their own probation. Nine of those probationary reelers regularly produced at least 200 pounds of yarn per hour by the end of their probation period, and each was retained as a regular employee. Two other reelers, however, did not meet this quota, and both were terminated within the first ninety days of their employment.[3]

For the first few weeks, Ferrell was assigned to the first shift of Masland's Reeling and Winding Department for training and orientation. Eddie Pressley was the department leader, and Gennell Arnold was the lead supervisor. Thereafter, Ferrell moved to the second shift, where she continued her training with Tammy Eles, the second shift supervisor, and Darlene Ryder, the reeler assigned to train her. Ferrell understood that, as a probationary reeler, she was required to produce at least 200 pounds of yarn per hour during the latter stages of her probation. In fact, she admits that Eles reminded her of this quota at least once a week during her probationary period.

During the first two months of her probationary period, Ferrell was repeatedly told by Eles that she was "doing good."[4] Indeed, Eles completed two monthly probationary associate progress reports which

2. The reeler's position is covered by a collective bargaining agreement between Masland and its labor union. Under the terms of the agreement, all new employees are required to complete a 90–day probationary period. The employee may be discharged at any time during that period, and he or she has no right to invoke the grievance or arbitration provisions within the collective bargaining agreement. After 90 days, however, employee discharge and discipline are subject to these provisions.

3. The twelfth probationary reeler quit before the end of her probationary period.

4. Ferrell Dep. at 63–64, 72.

rated Ferrell's "quantity of work" performance as "satisfactory."[5] This is the middle ranking on a five-level scale that ranges from "excellent" to "poor." According to Eles, she gave Ferrell this rating because "Ferrell was making process toward the required level of production" and because Eles "wanted to give [Ferrell] encouragement to continue working hard to get production up."[6]

In the last few weeks of the probationary period, however, Ferrell's "productivity had, at best, leveled off and she seemed to be decreasing."[7] Moreover, Pressley, Arnold and Eles were becoming concerned about apparent discrepancies in Ferrell's daily skein counts. To remedy this situation, Pressley instructed Eles to divide the buggies shared by Ferrell and Ryder with a piece of cardboard so that the number of skeins each reeler produced could be independently verified. Once the buggies were divided, Eles personally verified the skein counts and input the data into the computer following Ferrell's shifts. The production report showed that Ferrell had failed to meet the 200 minimum-pounds-per-hour requirement on ten of the last twenty-two days she worked. Thus, Ferrell was not regularly producing at least 200 pounds of yarn per hour by the end of her probation. Moreover, the production report covering Ferrell's entire probationary period revealed that her average production was only 167 pounds of yarn per hour.

As department leader, Pressley was ultimately responsible for evaluating probationary reelers and deciding whether a reeler would be retained as a regular employee. Although the shift supervisors prepare thirty and sixty day probationary associate progress reports, Pressley relies upon the computer-generated production reports to determine whether a reeler is achieving the required production standard during probation. Thus, Pressley was personally familiar with Ferrell's productivity based upon his review of her production reports. After reviewing Ferrell's production reports, Pressley concluded that Ferrell's production was erratic at best. As stated previously, not one probationary reeler who failed to achieve the required production standard was retained as a regular employee since Masland began its reeling operation several years ago. Accordingly, Pressley made the decision to terminate Ferrell.

On the eighty-ninth day of her probationary period, Ferrell was discharged. According to Pressley, he waited longer than he had with any other probationary reeler because Ferrell had a good attitude and tried hard to succeed. For these reasons, Pressley "kept hoping that [Ferrell] would make the [200 pounds of yarn per hour] production quotas."[8] As noted above, however, Ferrell only produced an average of only 167 pounds per hour during her entire probationary period, and she was not regularly producing 200 pounds per hour over the remaining weeks of her probation. Accordingly, Pressley, Arnold and Human Resources Manager Sara Skelton met with Ferrell, showed her the final production report, and terminated her employment. Although Ferrell be-

---

5. At about the time that Ferrell's 60–day evaluation was due, Tammy Eles was on a two-week leave. Accordingly, first shift supervisor Gennell Arnold, who had assumed responsibility for supervising the second shift reelers during Eles's absence, prepared what she considered to be a 60–day probationary associate progress report on Ferrell. In that report, Arnold rated Ferrell's "quantity of work" performance as "poor." This evaluation was based on Arnold's review of Ferrell's daily production reports, as well as the weekly production reports concerning Farrell contained within Masland's computer. After Eles

returned to work, Arnold gave her the progress report. Eles, however, thought the evaluation was a special 75–day evaluation, and she went ahead and prepared her own 60–day progress report. No one reviewed Arnold's evaluation with Ferrell, and it was apparently discarded.

6. Eles Aff. ¶ 6, attached to Prop. F/F.

7. *Id.*

8. Pressley Dep. at 27.

lieved she was regularly meeting the quota by the sixtieth day of probation, she did not dispute the validity or the accuracy of the skein counts recorded in her production reports.

Approximately two or three weeks before Farrell was discharged, she had a conversation with Alvin Simmons, the lead supervisor in Masland's Dye Department. Ferrell told Simmons that she might be pregnant, and Simmons responded that Ferrell needed to advise Arnold, because she was the lead supervisor in Ferrell's department. Simmons later discovered that Ferrell had not followed his instructions, so he informed both Pressley and Arnold about Ferrell's pregnancy. Although Simmons did not believe that Ferrell's pregnancy affected her productivity, he was concerned that stacking the skeins too high on a buggy could endanger Ferrell's unborn child. Specifically, Simmons feared that Ferrell could hurt her unborn child by raising her arms to stack the skeins on the buggy because he had heard an "old wives tale" that when pregnant women raise their arms, "their babies get strangled by the umbilical cord wrapped around their neck." [9] As Simmons explained, "I don't know if that's true or not; but I didn't want to take that chance with her child." [10]

As a result of Simmons' concern for Ferrell's unborn child, both Pressley and Arnold knew that Ferrell was pregnant prior to her termination. However, they deny that the pregnancy played any part in the decision to discharge Ferrell. Indeed, over the past several years, a number of Masland employees have become pregnant, taken a leave of absence, and returned to work thereafter. Moreover, with the exception of Farrell, neither Pressley nor Arnold could recall a single instance during their employment with Masland in which a pregnant employee had ever been terminated for any reason.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In reviewing a motion for summary judgment, the court must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *See Swain v. Hillsborough County School Bd.*, 146 F.3d 855, 857 (11th Cir.1998).

The party seeking summary judgment has the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party meets that burden, the non-moving party must set forth specific facts demonstrating that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). A genuine issue of material fact exists for trial if a reasonable jury could return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

To avoid an adverse ruling on a motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of [its] pleading." Fed R. Civ. P. 56(e). Nor may the non-moving party defeat a summary judgment motion by simply providing a mere "scintilla" of evidence. *See Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir.1999). Instead, there must be a genuine factual conflict in the evidence to support a jury question. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir.1999).

---

**9.** Simmons Dep. at 20–21.

**10.** *Id.* at 21.

## III. DISCUSSION

■ The Pregnancy Discrimination Act of 1978 amended Title VII of the Civil Rights Act of 1964 by providing that the prohibition against employment-related discrimination "because of sex" or "on the basis of sex" includes discrimination based on pregnancy, childbirth or related medical conditions. *See* 42 U.S.C. § 2000e(k). The analysis applied to pregnancy discrimination claims is the same analysis used in other Title VII sex discrimination cases. *See Maddox v. Grandview Care Center, Inc.,* 780 F.2d 987, 989 (11th Cir.1986) (citing *Hayes v. Shelby Memorial Hosp.,* 726 F.2d 1543, 1547 (11th Cir.1984)).

■ There are two types of discrimination actionable under Title VII: disparate treatment and disparate impact. *See Spivey v. Beverly Enterprises, Inc.,* 196 F.3d 1309, 1312 (11th Cir.1999). Disparate treatment, simply put, is intentional discrimination. *See Armstrong v. Flowers Hosp., Inc.,* 33 F.3d 1308, 1313 (11th Cir. 1994). Disparate impact claims, on the other hand, "involve employment practices that are facially neutral ... but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Here, Ferrell does not assert that Masland's 200 pounds-of-yarn-per-hour requirement adversely affects pregnant women. Rather, she contends that Masland fired her simply because she was pregnant. Accordingly, the court will analyze Ferrell's pregnancy discrimination claim under a disparate treatment theory and not under a disparate impact theory.

■ A plaintiff alleging pregnancy discrimination may attempt to establish disparate treatment by producing either direct or circumstantial evidence. *See Spivey,* 196 F.3d at 1312; *Armstrong,* 33 F.3d at 1313. *See also Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266 (11th Cir. 1999). In this case, Ferrell attempts to demonstrate disparate treatment through both methods.

### A. Direct Evidence

■ Direct evidence of discrimination is evidence, which if believed, proves the existence of a fact in issue without inference or presumption. *See Taylor v. Runyon,* 175 F.3d 861, 867 (11th Cir.1999); *Jones v. Bessemer Carraway Med. Ctr.,* 151 F.3d 1321, 1323 n. 11 (11th Cir.1998); *Burrell v. Board of Trustees of Ga. Military College,* 125 F.3d 1390, 1393 (11th Cir.1997).[11] If a plaintiff can demonstrate that her termination was prompted by her pregnancy, then "the ultimate issue of discrimination is proved." *Bell v. Birmingham Linen Serv.,* 715 F.2d 1552, 1556 (11th Cir.1983). In such a situation, summary judgment is inappropriate and the burden of persuasion at trial shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision even without the discrimina-

---

11. Ferrell quotes Judge Tjoflat's opinion in *Wright v. Southland Corporation,* 187 F.3d 1287 (11th Cir.1999), for the proposition that the Eleventh Circuit has adopted a looser definition of direct evidence. According to Ferrell, the definition applied in this Circuit is not the traditional definition set forth in the text accompanying this footnote, but is rather "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic." *Id.* at 1293.

The court disagrees. Judge Tjoflat's definition of direct evidence "is mere obiter dictum, as it was not necessary to the resolution of the case, and neither of the two other members of the panel joined that portion of the opinion." *Copley v. Bax Global, Inc.,* 80 F.Supp.2d 1342, 1348 (S.D.Fla.2000). Indeed, as the *Copley* court observes, the Eleventh Circuit has not since applied Judge Tjoflat's definition of direct evidence. *See Damon v. Fleming Supermarkets of Fla.,* 196 F.3d 1354, 1358–59 (11th Cir.1999). *See also Beaver v. Rayonier, Inc.,* 200 F.3d 723, 729–30 (11th Cir.1999). Accordingly, the court declines to adopt the definition of direct evidence propounded by Judge Tjoflat in *Wright* and urged by Ferrell in this case.

tory motive. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir.1998).

 "It is a rare case, however, where there exists actual direct evidence of discrimination." *Copley v. Bax Global, Inc.*, 80 F.Supp.2d 1342, 1348 (S.D.Fla. 2000). The reason that "true" direct evidence is the exception rather than the rule is that courts have found "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate" as constituting direct evidence of discrimination. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir.1993). For instance, a statement by an assistant store manager to a plaintiff that "we won't be hiring you ... because of conditions of your pregnancy" and that "[y]ou're welcome back after you've had the baby," is direct evidence of pregnancy discrimination. *See EEOC v. Wal–Mart Stores, Inc.*, 156 F.3d 989, 990–92 (9th Cir.1998). On the other hand, a comment by a partner of a law firm to a plaintiff that "if you were my wife, I would not want you working after having children," does not constitute direct evidence of pregnancy discrimination concerning the firm's decision to terminate the plaintiff after her pregnancy. *See Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir.1998). Thus, as these examples indicate, there must be a direct correlation between the adverse employment action and the discriminatory comment for such a statement to constitute direct evidence.

 Here, Ferrell's sole offer of direct evidence is Alvin Simmons's deposition testimony that he feared that an unborn child could become strangled by the umbilical cord if the mother raised her arms too high. According to Ferrell, this comment provides direct evidence that she was fired because Simmons, and thus Masland, harbored stereotypical views of pregnant women.

The court disagrees. Although Simmons' statement may provide circumstan-

tial evidence of his state of mind concerning pregnant women, the comment still requires the court to infer that Simmons' belief in an old wives tale somehow motivated Eddie Pressley's decision to terminate Ferrell. As the court previously explained, however, direct evidence does not require such an inferential leap. *Accord Burrell*, 125 F.3d at 1393–94 (a statement that merely suggests, but does not prove, a discriminatory motive is circumstantial evidence by definition). Therefore, Simmons' statement does not constitute direct evidence of pregnancy discrimination.

## B. Circumstantial Evidence

 Having determined that Ferrell has failed to produce any direct evidence of pregnancy discrimination, the court turns to the familiar three-step circumstantial evidence test established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing a prima facie of employment discrimination by a preponderance of the evidence. Where the plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge. If the employer does so, the burden then shifts back to the plaintiff to prove that the employer's proffered reason for the termination is merely a pretext for discrimination. *Id.* at 802–05, 93 S.Ct. at 1824–26.

### 1. Prima Facie case

 To establish a prima facie case of pregnancy discrimination, a plaintiff must demonstrate: (1) that she was a member of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse affect on her employment; and (4) that she suffered from differential application of work or disciplinary rules. *See Armstrong*, 33 F.3d at 1314. There is no dispute that Ferrell meets the first and third criteria—she was pregnant

and was terminated from her position as a probationary reeler. For the reasons given below, however, Ferrell has failed to satisfy the second and fourth elements of this test.

### a. Qualifications

▮▮▮▮▮ Ferrell was not qualified for a regular reeler's position. For the purpose of employment discrimination cases, an employee is considered to be "qualified" for a position if he or she meets the criteria that the employer has articulated for the position. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1300 n. 16 (11th Cir.1999) (citing *Thornley v. Penton Publishing, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997)). In the present case, Masland requires every probationary reeler to regularly produce at least 200 pounds of yarn per hour during the last twenty to thirty days of probation to be retained as a regular employee. According to Masland's production reports, however, Ferrell failed to meet the 200 pounds-per-hour quota on ten of the last twenty-two days she worked. Therefore, she was not regularly producing the required 200 pounds of yarn per hour by the end of her ninety-day probationary period and was thus not qualified to work as a regular Masland employee.

▮▮▮▮▮ The fact that Ferrell believed she had achieved the required production standard by the sixtieth day of her probation does not establish that she was qualified for a regular reeler position. To demonstrate that she was qualified, Ferrell must produce evidence which shows that she was meeting Masland's legitimate performance expectations at the time of her discharge. *See Thomas v. Eastman Kodak*, 183 F.3d 38, 56 (1st Cir.1999). Here, it is undisputed that Ferrell's production reports revealed that she had not met Masland's production requirement during the last thirty days of her employment. Ferrell admits she has no reason to believe that the reports are inaccurate, and she has never questioned the veracity of the reports, including the final report shown to her on the day of her termination. Instead, Ferrell simply contends that she thought she had achieved Masland's production standard during her probationary period. However, an employee's mere subjective belief that he or she is qualified to perform a particular job is insufficient to overcome objective evidence that the employee has in fact failed to meet the employer's legitimate production requirements. *See Geier v. Medtronic, Inc.*, 99 F.3d 238, 243 (7th Cir.1996). Therefore, Ferrell's mere belief that her production was sufficient does not demonstrate that she was qualified to work as a non-probationary reeler.

▮▮▮▮ Nor does the fact that Eles said Ferrell was "doing good" and gave her two satisfactory evaluations establish that Ferrell was qualified for a regular reeler position. Simply because a low-level supervisor compliments an employee's performance does not mean that an issue of triable fact has been created whenever a higher-level supervisor subsequently gives that same employee a negative evaluation. *See Abioye v. Sundstrand Corp.*, 164 F.3d 364, 369 (7th Cir.1998). Accordingly, Ferrell has not established that she was qualified to work as a regular reeler simply because Eles did not criticize her performance.

### b. Differential treatment

▮▮▮▮ Ferrell has not produced any evidence to show that a non-pregnant employee was treated more favorably than she. Ferrell contends that this differential treatment is shown by the fact that Masland retained as regular employees at least three non-pregnant probationary reelers who produced an average of less than 200 pounds per hour over the course of their probation. The problem with this argument is that it ignores the relevant focus for determining whether a probationary reeler will be kept on the Masland payroll. To be retained as a regular Masland employee, a probationary reelers does not

need to produce an average of at least 200 pounds per hour over the course of their entire probationary period. Rather, a probationary reeler need only regularly produce at least 200 pounds of yarn per hour during the last twenty to thirty days of probation. Indeed, the three probationary reelers cited by Ferrell went on to regularly produce more than 200 pounds of yarn per hour during the last twenty to thirty days of their probation. Furthermore, Masland has produced evidence which establishes that each probationary reeler (including Ferrell) who failed to produce at least 200 pounds of yarn per hour on a regular basis before the end of probation was discharged. Ferrell has provided no evidence to the contrary. Therefore, having failed to show that Masland treats non-pregnant probationary reelers any more favorably than pregnant probationary reelers, Ferrell has failed to establish a prima facie case of disparate treatment.

### 2. Pretext

Even assuming that Ferrell established a prima facie case, the court would nonetheless grant Masland's motion for summary judgment because Ferrell has not produced any evidence which demonstrates that Masland's legitimate, nondiscriminatory reason for terminating her employment was a pretext for pregnancy discrimination.

The burden of producing a legitimate, nondiscriminatory reason that rebuts an employee's prima facie case of discrimination is relatively low. An employer does not need to "prove" the absence of a discriminatory motive to meet its burden under *McDonnell Douglas*. Rather, it need only articulate a legitimate, nondiscriminatory reason for the employee's termination. *See Board of Trustees v. Sweeney*, 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978). As long as the evidence "could allow a rational fact finder to conclude" that the termination was not based on a discriminatory motive,

the court must accept the employer's explanation. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir.1998).

As stated previously, Masland asserts that Ferrell was terminated because she failed to regularly produce at least 200 pound of yarn per hour during the last twenty to thirty days of her probation. Poor job performance is a legitimate, nondiscriminatory reason for discharging an employee. *See Damon*, 196 F.3d at 1361. Accordingly, the burden now shifts back to Ferrell to offer probative evidence which demonstrates that Masland's reason for termination was a pretext for pregnancy discrimination. Of course, the court must not weigh conflicting evidence or make any credibility determinations. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in h[er] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). After reviewing the record and the submissions of the parties, the court concludes that Ferrell has failed to overcome Masland's legitimate, nondiscriminatory explanation for her discharge.

Ferrell first contends that Alvin Simmons' suggestion that Ferrell's unborn child could be harmed if she raised her arms too high while stacking skeins of yarn constitutes circumstantial evidence of pregnancy discrimination. According to Ferrell, a jury could infer that Masland is liable for Simmons' "stereotypical views ... because it placed him in a position that could have contributed to a promotional decision." [12] As Ferrell points out, Simmons told both Eddie Pressley, the department leader, and Gennell Arnold, the lead supervisor, that Ferrell was pregnant before she was terminated. The Eleventh Circuit has repeatedly recognized that an employer may be held liable for employment discrimination if the actions of a neutral decision maker are somehow influ-

12. Doc. 27 at 7.

enced by the prejudice of a non-decision maker. *See, e.g., Schoenfeld v. Babbitt,* 168 F.3d 1257, 1268 (11th Cir.1999); *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1527 (11th Cir.1991); *Jones v. Gerwens,* 874 F.2d 1534, 1541 n. 13 (11th Cir.1989). The difference here, however, is that there is no evidence to indicate that Simmons "influenced" the decision to terminate Ferrell by doing anything more than notifying Pressley and Arnold that Ferrell was pregnant. Simmons, after all, was not Ferrell's supervisor (Simmons supervises the Dye Department; Ferrell worked in the Reeling and Winding Department), he had no supervisory authority over her, and he never evaluated her work. Moreover, although Pressley and Arnold both acknowledge that Simmons informed them of Ferrell's pregnancy, each has testified that the pregnancy had absolutely nothing to do with her discharge. Pressley also testi-

fied that he made the decision (with Arnold's concurrence) to let Ferrell go, and that Simmons played no part whatsoever in Ferrell's termination. Ferrell has offered no evidence or argument to the contrary. Consequently, the court rejects the argument that an employment decision is somehow motivated by the purported stereotypical views of a non-decision maker, when that non-decision maker did nothing more than inform the decision maker of the employee's protected status.

■ Ferrell's final argument is that she was terminated because Masland was concerned about labor costs and lost time to maternity leave. To support this assertion, she has offered a medical questionnaire that Masland required her to fill out when she was hired, as well as deposition testimony by Pressley. The questionnaire states in relevant part:

FOR FEMALES:

Do you have any female or menstrual trouble _____ Date of last period _____
How may children _____ Lose time due to cramps _____ how much _____

---

Masland Carpets Inc. Med. History—Questionnaire, Ex. 3 to Pressley Dep. attached to Doc. 27. Ferrell takes the position that this questionnaire, when combined with Pressley's deposition testimony that "it was whatever it took to get there. I mean we worked whatever hours we needed. And within the past year, probably, the emphasis was on service and controlling costs," provides circumstantial evidence that Masland's stated reason for discharging her was simply a pretext for controlling costs that would have been generated by her maternity leave.

The court disagrees. First, the decision maker in this case, Eddie Pressley, testified that he had never seen the questionnaire before Ferrell's attorney showed it to him during his deposition. Second, Pressley's testimony has been taken out of context—indeed, it was given in response to a question from Ferrell's attorney con-

cerning Masland's efforts to control costs *after* Ferrell's termination. Finally, Pressley and Arnold both testified that numerous Masland employees have become pregnant, taken a leave of absence, and returned to work after the delivery, all without adversely affecting costs or production. Indeed, neither supervisor could recall a single pregnant employee other than Ferrell who had ever been terminated. Once again, Ferrell fails to offer any evidence to the contradict these assertions. The court thus concludes that Ferrell has not presented sufficient circumstantial evidence to demonstrate that Masland's legitimate, nondiscriminatory reason for her discharge was pretext for pregnancy discrimination.

## IV. CONCLUSION

For the foregoing reasons, the court concludes that Ferrell has failed to set

forth a prima facie case of pregnancy discrimination. Even assuming that Ferrell had established a prima facie case, she has not produced any evidence to show that Masland's legitimate, nondiscriminatory reason for terminating her employment was a pretext for pregnancy discrimination. The court therefore **GRANTS** Masland's motion for summary judgment.