**Richard ASAD, et al.   Plaintiffs**

v.

**CONTINENTAL AIRLINES, INC. Defendant**

**No. 1:99–CV–2194.**

United States District Court, N.D. Ohio, Eastern Division.

June 4, 2004.

Richard C. Haber, Roy A. Hulme, Reminger & Reminger, Cleveland, OH, for Plaintiffs.

Heather C. Logan, Matthew P. Moriarty, Tucker Ellis & West, Cleveland, OH, for Defendant.

*MEMORANDUM OF OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT NUNC PRO TUNC TO 4 JUNE 2004*

WELLS, District Judge.

This case involves a personal injury action against Continental Airlines, Inc. ("Continental") based on the theory that Continental was negligent by refusing to transfer its pregnant employee, Darlene Asad, with the result that her unborn child was exposed to carbon monoxide which proximately caused her son Richard Asad's birth defects. Based on Continental's purported negligence in failing to transfer his mother despite alleged fetal health concerns and her requests to do so, the child, plaintiff Richard Asad, has sued Continental for causing his injuries (Count I) and his parents, Darlene and William Asad, have advanced loss of consortium claims against Continental (Count II). (Docket # 1, Compl.).

Currently before the Court is defendant Continental's motion for summary judgment. (Docket # 92). In its motion, Continental contends that it is entitled to summary judgment on plaintiff Richard Asad's negligence claim for three separate reasons: 1) Continental has no duty to the unborn children of its employees; 2) even if it has such a duty, it did not breach this duty by failing to transfer Ms. Asad; and 3) Richard Asad's negligence claim is preempted by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k). Based on its arguments that Richard Asad's negligence claim fails as a matter of law, Continental asserts that his parents' loss of consortium claims must fail as well. Plaintiffs Richard, Darlene, and William Asad filed their response to defendant's motion on 8 December 2003. (Docket # 104). Continental then filed a reply. (Docket # 107).

For the reasons set forth below, Continental's motion for summary judgment will be denied.

## I. BACKGROUND

To provide the necessary context for analyzing Continental's summary judgment motion, the Court will describe Ms. Asad's employment with Continental, Continental's employee transfer policy, and Ms. Asad's pregnancy and transfer requests.

### A. Ms. Asad's Employment with Continental

Plaintiff Darlene Asad began her employment with Continental in June of 1996 as a part-time customer service agent ("CSA"), working in the baggage room at Terminal C of the Hopkins International Airport in Cleveland, Ohio. (Docket # 93, at 16 and 67–71, Deposition Transcript of Darlene Asad ("Ms. Asad Dep.")). About six weeks later, Ms. Asad bid for and received an "on-line runner" position working on the Continental Express ramp.[1]

---

1. While Ms. Asad worked with Continental Express aircraft, she was still an employee of Continental Airlines, Inc. (Ms. Asad Dep. at 22–23; Docket # 9, at ¶ 5).

(Ms. Asad Dep. at 73–74). Shortly thereafter, near the end of 1996, Ms. Asad bid for and received a CSA position on Continental Express' ramp ("Ramp CSA"). (Ms. Asad Dep. at 80–81).

Becoming pregnant in January 1997, Ms. Asad worked, throughout her pregnancy, as a Ramp CSA on a part-time basis, which typically consisted of four five-hour shifts and one eight-hour shift per week. (Ms. Asad Dep. at 83, 91–92, 98). As a Ramp CSA, Ms. Asad performed work near inbound and outbound turboprop aircraft and her duties included directing aircraft, checking their wheels, setting up cones to delineate safety zones, plugging aircraft into ground power units, and loading and unloading baggage. (Ms. Asad Dep. at 102–105). In addition to her duties as a Ramp CSA, Ms. Asad was sometimes required to help de-ice jet aircraft at their gates. (Ms. Asad Dep. at 83–85). However, after 19 February 1997, Ms. Asad never actually participated in spraying the de-icing fluid. (Ms. Asad Dep. at 161–62).

After her son was born, Ms. Asad returned to work at Continental, last working for it in April of 1999. (Ms. Asad Dep. at 59 and 83).

## B. Continental's Employee Placement and Transfer Policy

Continental maintains an employment policy covering the placement and transfer of its Field Service employees, like Ms. Asad. (Broussard Aff. at ¶¶ 2–3, Ex. 1). Under Continental's bidding system, all employees must, at regular intervals, either re-bid for their current position or bid for a new position. (Ms. Asad Dep. at 97–98 and 108). The normal procedure for transferring among Field Service positions involves a modified merit, classification, and seniority-based bidding system whereby employees bid for certain vacant positions and these positions are assigned on the basis of seniority, the type of transfer being requested, and the employee's qualifications. (Broussard Aff. at ¶¶ 2–3, Ex. 1). Continental's policy outlines the following hierarchical system whereby vacancies are filled by transferring Field Service employees:

*Category 1:* Transfers within a classification, *i.e.* ASA[2] to ASA or CSA to CSA are considered Category 1. When a vacancy occurs in a location, the senior team member in Category 1 for that classification will be awarded the position.

*Category 2:* Transfers to a different agent classification, *i.e.* CSA to ASA . . . . After Category 1 has been exhausted Category 2 team members will be called in seniority order and awarded the position.

*Category 3:* Transfer from all classifications other than agent positions will be considered Category 3. Once Categories 1 and 2 have been exhausted, an interview process will be conducted to select the person best suited/qualified within Category 3. Seniority will be used as a tie breaker when all else is equal.

Category 3 must be exhausted and positions awarded prior to moving to Category 4 unless team members in Category 3 are deemed to be not suited for the position. The need for training will not deem a team member unsuited for the position.

*Category 4:* Team members from Continental Express, Inc. submitting a bid to move employment to Continental. Once Categories 1, 2, and 3 have been exhausted, an interview process will be

---

**2.** An ASA is an airport sales agent.

conducted to select the person best suited/qualified within Category 4. (Broussard Aff. at ¶ 2, Ex. 1, at 24–25).

While Continental's Manager of Human Resources, Stephanie Broussard, asserts that "hardship transfers" for documented medical reasons also may be available, but that there was no exception to the transfer policy for "able-bodied" employees with medically undocumented health concerns, no such "hardship transfer" policy is outlined in Continental's transfer policy manual. (Broussard Aff. at ¶¶ 2–4, Ex. 1).

## C. Ms. Asad's Pregnancy and Transfer Requests

When Ms. Asad became pregnant in January 1997, she began to develop concerns about air quality in her workplace, her exposure to certain substances, and the health of her fetus. (Ms. Asad Dep. at 17–18, 54–55, and 181). She first mentioned her concerns about air quality to Jack Ziegelmayer, who was the supervisor of the Continental Express ramp at the time, and asked him about Continental's policy concerning pregnant ramp workers. (Ms. Asad Dep. at 156–59). Mr. Ziegelmayer responded that Continental had no policy specifically related to pregnant workers and that her options were limited to either bidding for a different position according to the regular bidding process or taking a leave of absence. (Ms. Asad Dep. at 160–61). Around the same time, Ms. Asad conducted internet research on the possible effects of workplace exposure to jet fumes. (Ms. Asad Dep. at 15 and 19–20 and 157, Exs. A, B, C, D, E, and F). On or about 19 February 1997, Ms. Asad delivered a letter to Steven Marvin, Continental's Director of Terminal Operations, enclosing some of her research on workplace exposure to jet fumes, expressing health concerns related to her fetus, and requesting a transfer. (Ms. Asad Dep. at 18–19 and 163–64, Exs. A, E, and G). In her letter, Ms. Asad wrote, in part:

> I recently spoke to Jack to let him know that I just found out that I was pregnant and am concerned about the effects of de-icing fluids and fumes from the planes and various equipment outside on the COEX ramp and what they may potentially do to an unborn child. . . . Since I couldn't afford to take the [leave of absence] I had to try to day trade as much as possible and wait for the new bid. I am worried that I won't be able to get a line on escorts when the new bid comes due to my low seniority.
>
> \*      \*      \*      \*      \*      \*
>
> I would like to make clear to you that I am NOT asking for anyone to excuse me from work; I am just asking that during my pregnancy I be allowed to work a different line that won't expose myself and my baby to these fumes.
>
> \*      \*      \*      \*      \*      \*
>
> I hope that you will be able to help me find a temporary line to work in during my pregnancy (if I am not able to bid escorts) so that I will not have to worry so much where the health of my unborn child is concerned.

(Ms. Asad Dep., Ex. G). Ms. Asad received no response to this letter despite following up with Director Marvin's office. (Ms. Asad Dep. at 164–65).[3]

On or about 10 June 1997, Ms. Asad delivered a second letter reiterating her concerns regarding the jet fumes and requesting a transfer. (Ms. Asad Dep. at 167).[4] She addressed this letter generical-

---

**3.** Although it offers no evidence to contradict Ms. Asad's testimony, Continental denies ever receiving the 19 February 1997 letter, accepting it as true only for the purpose of this motion. (Docket # 93, at 4 n. 4).

**4.** Although it offers no evidence to contradict Ms. Asad's testimony, Continental denies ever having received the 10 June 1997 letter, accepting it as true only for the purpose of this motion. (Docket # 93, at 6 n. 6).

ly to "Terminal Operations" because she thought that perhaps her first letter was addressed to the wrong person. (Ms. Asad Dep. at 167). Ms. Asad wrote:

This is a follow up to the first letter that I sent to Steve Marvin back in February, 1997. I am again writing this one out of concern for the safety of my unborn child.

As previously discussed, I was going to try to bid a line on escorts (for all bids during my pregnancy) but I did not have the seniority needed. This makes me more concerned about the fumes effecting [sic] my pregnancy.... I have already had a few days where the fumes made me physically ill forcing me to come inside.

\* \* \* \* \* \*

I am not asking to be put inside or separated from the fumes indefinitely, just until my child is born. I have talked to co-workers who have had this type of accomodation [sic] made for them during their pregnancies and I am simply asking for the same consideration.

(Ms. Asad Dep., Ex. H). Ms. Asad received no response to her second letter either. (Ms. Asad Dep. at 221).

5. Continental argues that Ms. Asad's testimony regarding accommodations Continental allegedly made to other pregnant workers is inadmissible hearsay and should not be used to oppose Continental's motion for summary judgment. (Docket # 107, at 6–7). Based on Ms. Asad's deposition transcript, at least with respect to Ms. Meckley, it is unclear how much, if any, of her testimony is hearsay, as her testimony may have been based on her first-hand observations (i.e. Ms. Meckley used to work with her as a Ramp CSA, Ms. Meckley moved to a new position after becoming pregnant, and Ms. Meckley's transfer occurred in the middle of a bid). In any event, because the Court's ultimate decision does not depend on Continental's alleged treatment of Ms. Meckley and Ms. Newsome, it is unnecessary to rule on Continental's hearsay objections at this time.

Ms. Asad claims that two of her co-workers, Jen Newsome and Debbie Meckley, received accommodations during the course of their pregnancies. (Ms. Asad Dep. at 32–33 and 174–75).[5] According to Ms. Asad, although she and Ms. Meckley were pregnant around the same time and both told Mr. Ziegelmayer about their pregnancies, Ms. Meckley, unlike Ms. Asad, was taken off the Express ramp and was given a position as an escort. (Ms. Asad Dep. at 174–75 and 191–92).[6]

During the three bidding cycles which took place during Ms. Asad's pregnancy, Ms. Asad only bid for the Continental Express Ramp CSA position. (Ms. Asad Dep. at 98 and 232). Within CSA, it was also possible to bid for a variety of other jobs, including positions working jets, as an on-line or local runner, in the bag room, and as an escort. (Ms. Asad Dep. at 109–110 and 187).[7] According to Ms. Asad, on-line or local runner and jet CSA positions most likely were available during the three bidding cycles. (Ms. Asad Dep. at 233). While there were some escort positions available when she was bidding for her positions, Ms. Asad claims that she could not work any of the available escort shifts because they were evening shifts only and conflicted with her child care responsibilities. (Ms. Asad Dep. at 112–13 and 188).[8]

6. Although Ms. Meckley was a full-time employee with more seniority than Ms. Asad, Ms. Asad testified that Ms. Meckley did not receive the position through the normal bidding process but rather obtained it in the middle of a bid. (Ms. Asad Dep. at 175–76 and 191–92).

7. Ms. Asad also explained that, while it was technically possible to transfer to an ASA position at the ticket gates, she would need to go through a four-week training program in Houston, which she considered not feasible for her given her care-giving responsibilities for her two children at home. (Ms. Asad Dep. at 186–88).

8. After Richard Asad was born and Ms. Asad went back to work, she bid for and received a job on "escorts." (Ms. Asad Dep. at 109). As

Though Ms. Asad maintained fetal health concerns related to her Ramp CSA position, she testified that she could not afford to quit or take an unpaid leave of absence and was given no other option. (Ms. Asad Dep. at 97, 125–26, 171–73, and 228).[9]

Ms. Asad continued working at Continental until a week before her son, Richard Asad, was delivered on 5 August 1997. (Ms. Asad Dep. at 16 and 82–83). Born prematurely, Richard Asad has been diagnosed as having a brain injury known as periventricular leukomalacia, and cerebral palsy. (Docket # 93, at 6, and # 104, at 3).

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the evidence in the record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, where the nonmoving party has the burden of proof in a case, the moving party can satisfy its initial burden "by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

If the motion is properly made and supported as provided in Rule 56(c), the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. It is not enough for the nonmoving party to point to any alleged factual dispute between the parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) To survive summary judgment, the dispute must involve a genuine issue of material fact; that is, a fact that might affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (noting that the "mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].")

Summary judgment is intended as a mechanism for isolating and disposing of "factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. To that end, the inquiry on summary judgment mirrors the directed verdict standard, and summary judgment should be entered when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (quoting *Matsushita Elec. Industrial Co.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). If the nonmoving party bears the burden of proof at trial and fails to present "a jury question as to each element of its case," the motion for summary judgment must be granted. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996) (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548). Given the focus of

---

an escort, Ms. Asad's duties included driving a shuttle bus and taking passengers to their designated flights. (Ms. Asad Dep. at 109–110).

**9.** While Ms. Asad testified that local runner and jet positions were likely available in bidding cycles during her pregnancy, it is unclear, on the record before the Court, whether she could have obtained those positions and, if so, whether those positions would have reduced her exposure to jet fumes.

summary judgment on evaluating what a reasonable jury could find, courts may not consider hearsay evidence in reaching their conclusions. *Hartsel v. Keys*, 87 F.3d at 799. In considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## III. *LAW AND ANALYSIS*

Based on Continental's purported negligence in failing to transfer Ms. Asad despite alleged fetal health concerns and her requests for a transfer, plaintiff Richard Asad has sued Continental for causing his injuries (Count I) and his parents, Darlene and William Asad, have advanced loss of consortium claims against Continental (Count II). (Docket # 1, Compl.). In its motion, Continental contends that it is entitled to summary judgment on plaintiff Richard Asad's negligence claim for three separate reasons: 1) Continental has no duty to the unborn children of its employees; 2) even if it has such a duty, it did not breach this duty by failing to transfer Ms. Asad; and 3) Richard Asad's negligence claim is preempted by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k). Based on its arguments that Richard Asad's negligence claim fails as a matter of law, Continental asserts that his parents' loss of consortium claims must fail as well.

## A. Negligence

█ Under Ohio law, a plaintiff must prove the following elements to succeed on a negligence claim: 1) existence of a duty; 2) breach of that duty; 3) proximate cause;

and 4) damages. *Hester v. Dwivedi*, 89 Ohio St.3d 575, 578, 733 N.E.2d 1161 (2000). Continental challenges Richard Asad's ability to prove the first two elements of negligence, existence of a duty owed by it to Richard Asad and breach of such duty, and asserts that, in any event, his negligence claim is preempted by federal law.

### 1. *Duty of Care to Richard Asad*

█ In an argument most clearly articulated in its reply brief, Continental contends that it, as a matter of law, has no duty to the unborn children of its employees, including Richard Asad. The existence of a duty in a negligence action is a question of law for the court to determine. *Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989). Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff. *Commerce & Industry Ins. Co. v. Toledo*, 45 Ohio St.3d 96, 98, 543 N.E.2d 1188 (1989). In this context, duty is best defined as the court's "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Mussivand*, 45 Ohio St.3d at 318, 544 N.E.2d 265 (quoting Prosser, *Law of Torts*, at 325–326 (4th ed.1971)). While there is no particular formula for ascertaining whether a duty exists, the existence of duty largely depends on the foreseeability of injury. *Id.; Commerce & Industry Ins.*, 45 Ohio St.3d at 98, 543 N.E.2d 1188; *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645, 597 N.E.2d 504 (1992).[10]

---

**10.** The test for foreseeability is "whether a reasonably prudent person, under the same or similar circumstances as the defendant, should have anticipated that injury to the plaintiff or to those in like situations is the probable result of the performance or nonperformance of an act." *Commerce & Industry*, 45 Ohio St.3d at 98, 543 N.E.2d 1188. It is not necessary that the injury to the particular plaintiff be foreseeable; rather it is enough "that the act in question may, in all human probability, produce harm to persons similarly situated." *Gedeon v. East Ohio Gas Co.*, 128 Ohio St. 335, 338–39, 190 N.E. 924 (1934). In its summary judgment motion,

As a threshold matter, it is well-established that, under Ohio law, children, born alive or stillborn, may bring, or have brought on their behalf, an action for injuries sustained because of the negligence of another, while they were viable but still in their mother's womb. *Williams v. Marion Rapid Transit*, 152 Ohio St. 114, 87 N.E.2d 334, syllabus ¶ 2 (1949); *Jasinsky v. Potts*, 153 Ohio St. 529, 530, 92 N.E.2d 809 (1950); *Peterson v. Nationwide Mut. Ins. Co.*, 175 Ohio St. 551, 554–55, 197 N.E.2d 194 (1964); *Werling v. Sandy*, 17 Ohio St.3d 45, 476 N.E.2d 1053, syllabus (1985). Continental does not dispute the point of law that, in general, third-party tortfeasors can be sued for causing fetal injuries to children. (Docket # 107, at 2). Indeed, every state allows children born alive to recover in tort for prenatal injuries caused by third parties. *International Union v. Johnson Controls, Inc.*, 499 U.S. 187, 213, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (White, J. *concurring* ). Continental suggests instead that it cannot be liable to Richard Asad because, under the particular circumstances of this case, it owed him no duty.

Negligence actions may be premised on either "acts of omission or acts of commission." 47 OHIO JUR.3d *Negligence* § 10 (1986). This distinction has otherwise been explained as one between nonfeasance and misfeasance, respectively. BLACK'S LAW DICTIONARY 1000 and 1054 (6th ed.1990); Restatement (Second) of Torts § 314, cmt. c (1965).[11] A negligence claim based on nonfeasance involves the "failure to do an act that a person is under a duty to do and that a person of ordinary prudence would have done under the same or similar circumstances, or the failure to take action to protect another from harm." 57 AM. JUR.2d *Negligence* § 13. A negligence claim for misfeasance, on the other hand, arises from "the improper doing of an act that a person might lawfully do or active misconduct that causes injury to another." *Id.* While there is not always a rigid distinction between the two, misfeasance generally exists if the defendant is "responsible for making the plaintiff's position worse, i.e., the defendant has created a risk" whereas nonfeasance "is found if the defendant has failed to aid the plaintiff through beneficial intervention." *Id.*

Ohio law adheres to this distinction, which carries significant implications for determining the existence, or lack thereof, of a legal duty in a particular circumstance. *Estates of Morgan v. Fairfield Family Counseling Ctr.*, (1997), 77 Ohio St.3d 284, 293, 673 N.E.2d 1311 n. 2 (1997). As explained by the Ohio Supreme Court in *Morgan*, the law imposes a duty to refrain from active misconduct that causes a positive injury to others, but does not generally impose a duty to take affirmative action to aid or protect another. *Id.; see also Homan v. George*, 127 Ohio App.3d 472, 475, 713 N.E.2d 432 (1998). An affirmative duty to aid or protect another only arises when a "special and definite" relationship, such as employer and employee, exists between the parties. *Jackson v. Forest City Enterprises, Inc.*, 111 Ohio App.3d 283, 285, 675 N.E.2d 1356 (1996); *Clemets v. Heston*, 20 Ohio App.3d 132, 135–136, 485 N.E.2d 287 (1985) (explaining that negligence actions predicated on nonfeasance require the existence of a definite and particular relationship between the parties"). In other words, un-

Continental has not made any specific arguments regarding foreseeability.

**11.** The seventh edition of Black's Law Dictionary, published in 1999, maintains the same distinction between nonfeasance, or the failure to act when a duty is imposed, and misfeasance, or the performance of wrongful acts in an unlawful manner.

der Ohio law, a legal duty may be imposed in misfeasance actions if the resulting injury was foreseeable, but in nonfeasance actions such duties are limited to certain types of relationships.[12]

■ Continental frames Richard Asad's negligence claim as being based on alleged nonfeasance arising from its failure to protect Richard Asad. (Docket # 107, at 1) (arguing that "Plaintiffs seek to stand the law of negligence on its head [by] arguing that [Continental] owed a duty to protect Richard Asad by transferring Darlene Asad away from the Ramp CSA position. . . .") Accordingly, Continental proceeds down a path of legal analysis attempting to demonstrate that it lacked the necessary "special and definite relationship" with Richard Asad to support a duty to protect him. Such an analysis is, however, based on the false premise that Richard's Asad's claim is predicated on nonfeasance rather than misfeasance. As such, Continental confuses the gravamen of Richard Asad's claim.

Richard Asad's claim is not based on an affirmative duty to protect, where the failure to do so would constitute nonfeasance, but rather on Continental's duty to avoid causing foreseeable injuries to another or, in other words, to avoid misfeasance. Continental's failure to transfer Ms. Asad from an allegedly hazardous environment for the course of her pregnancy, despite her repeated requests that it do so, does not implicate some duty to protect Richard Asad but rather its duty to avoid causing him injury. Assuming for the purpose of this argument that the environment in which Ms. Asad worked contained carbon monoxide levels of such toxicity that they caused Richard's Asad's cerebral palsy, (Docket # 107, at 3), Continental's failure to grant the transfer request of a pregnant employee, or otherwise address fetal exposure to injurious substances, were acts of commission amounting to misfeasance since they resulted in exposing the unborn child to a toxic level of carbon monoxide. Under these assumed circumstances, Continental can be said to have created a risk to a pregnant mother's fetus and to have maintained employment policies which may have increased this risk. Because these alleged actions implicate the common law duty to avoid causing foreseeable injuries to others, Continental's argument that it has no duty to Richard Asad is misplaced.[13]

## 2. Breach/Scope of the Duty

■ In Continental's second argument, it urges that, even if it had some duty to Richard Asad, it did not have a duty to transfer Darlene Asad. While Continental frames its argument as whether, as a matter of law, it has a duty to circumvent an established seniority system of job

12. Some examples of relationships in which there is an affirmative duty include: 1) common carrier and its passengers; 2) innkeeper and guests; 3) possessor of land and invitee; 4) custodian and individual taken into custody; and 5) employer and employee. *Jackson*, 111 Ohio App.3d at 285, 675 N.E.2d 1356.

13. Even if this case solely involved the question of nonfeasance, Continental's arguments related to duty would likely be unavailing. In this case, assuming that its workplace contained toxic emissions injurious to a fetus, Continental may be said to have created a dangerous condition for a fetus and thus may have a duty to prevent further harm to the fetus. *See* RESTATEMENT OF TORTS § 322 (2nd ed.1965) (individuals have a duty to exercise reasonable care to prevent further harm if they know or have reason to know that their conduct, whether tortious or innocent, has caused bodily harm to another as to make him helpless and in danger of further harm). Although such an analysis would raise complicated questions related to whether the Continental's conduct caused Richard Asad harm and whether it knew or should have known of that potential harm, questions implicated by the other elements of negligence, such questions need not be addressed here.

bidding and transfer to prevent injuries to an employee's unborn child, this issue is rife with factual questions and disputes which must be resolved by the factfinder. Continental's argument involves the scope and extent of its duty to Richard Asad and whether such duty was breached. While the existence of a duty is, in the first instance, a question of law, the scope and extent of the duty owed is ultimately a question of fact. *Mussivand,* 45 Ohio St.3d at 318, 544 N.E.2d 265 (1989). Once a common-law duty is found to exist, the fulfillment of that duty is not defined by or limited to a particular course of action, but rather imposes on the defendant the requirement to "exercise that degree of care which an ordinarily careful and prudent person would exercise under the same or similar circumstances." *Commerce & Industry Ins. Co. v. Toledo,* 45 Ohio St.3d 96, 98, 543 N.E.2d 1188 (1989); *Mussivand,* 45 Ohio St.3d at 318, 544 N.E.2d 265 (noting that a person must exercise the care necessary to avoid injury to others). Whether a defendant properly discharged his duty of care is normally a question for the jury. *Commerce & Industry,* 45 Ohio St.3d at 98, 543 N.E.2d 1188. In other words, once the Court determines that a duty exists, it is usually left to the jury "to decide whether a plaintiff falls within the range of a defendant's duty of care and whether that duty was fulfilled." *White v. Smith & Wesson Corp.,* 97 F.Supp.2d 816, 829 (N.D.Ohio 2000).

Relying extensively on *U.S. Airways v. Barnett,* 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002), defendants argue that the strong public policy favoring seniority-based employee bidding and transfer systems precludes any requirement on its part to transfer Darlene Asad. While *Barnett* discussed the importance of the uniform application of a seniority-based system, it did so in a very different context. *Barnett* was an ADA case in which the United States Supreme Court was faced with the issue of "the relationship between seniority systems and the plaintiff's need to show that an 'accommodation' seems reasonable on its face." *Id.* at 402, 122 S.Ct. 1516. The U.S. Supreme Court held that a requested accommodation which conflicts with seniority rules is ordinarily not reasonable, but an employee may present evidence of special circumstances that makes an exception to seniority rules reasonable under particular facts. *Id.* at 403–405, 122 S.Ct. 1516. Nowhere in *Barnett* does the U.S. Supreme Court suggest or imply that the existence of a seniority system could be used as a defense to a negligence claim.

■■■ Regardless of whether transferring Darlene Asad would violate Continental's established seniority bidding and transfer rules, the question remains whether its failure to do so constituted a breach of a duty to Richard Asad. Noting that Darlene failed to give Continental information from a physician suggesting a transfer was medically necessary, Continental contends that it should not have to deviate from its seniority-based system simply because of Darlene Asad's allegedly speculative health concerns.[14] Viewing the facts in favor of Ms. Asad, this argument appears disingenuous since Continental never responded to Ms. Asad's requests for a transfer and its written transfer policy does not specifically provide for an exception for health reasons; nor does it specify the documentation an employee must provide to obtain a health-related

---

14. Continental also suggests that it should not have to transfer Ms. Asad because she failed to take advantage of the normal bidding and transfer process. Not only does this issue implicate a factual dispute, but also Continental cannot avoid a duty to Richard Asad simply by pointing to Darlene Asad's own alleged misconduct.

transfer. Moreover, it allegedly transferred another pregnant employee outside the normal transfer system. In any case, given the hotly contested circumstances of this case, Continental is not entitled to judgment as a matter of law on the basis that the exercise of due care did not require granting Darlene Asad's request for a transfer.

### 3. *Preemption*

Continental's final argument is that Richard Asad's negligence claim is preempted by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). This assertion involves an unsettled question first raised by the U.S. Supreme Court in *International Union v. Johnson Controls, Inc.*, 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) but ultimately left unanswered.

Given the complexity of the issue and the lack of cases on point, the Court examines the content and purpose of the Pregnancy Discrimination Act, the doctrine of preemption, particularly within the context of Title VII, the U.S. Supreme Court's decision in *Johnson Controls*, and subsequent, related decisions by lower courts. Then principles garnered from the foregoing analysis are applied to resolve the issue of preemption presented by this case.

### a. *Pregnancy Discrimination Act*

In 1978, Congress enacted the Pregnancy Discrimination Act to specify that sex discrimination under Title VII includes discrimination on the basis of pregnancy and related medical conditions, reversing the United States Supreme Court's previous decision in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). *California Fed.*

*Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 277, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987).[15] The PDA amended Title VII to include 2000e(k) which provides in pertinent part:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work ....

The purpose of Title VII, including the PDA, is "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of ... employees over other employees." *Guerra*, 479 U.S. at 288, 107 S.Ct. 683 (citations omitted). As demonstrated by its legislative history, the PDA was enacted to "guarantee women the basic right to participate fully and equally in the workforce, without denying them the fundamental right to full participation in family life." *Id.* at 289, 107 S.Ct. 683; *Johnson Controls*, 499 U.S. at 204, 111 S.Ct. 1196 (explaining that "[w]omen as capable of doing their jobs as their male counterparts may not be forced to choose between having a child and having a job"). With the PDA, Congress made evident that it was protecting the decisional autonomy of women to become pregnant and to work while pregnant. *Johnson Controls*, 499 U.S. at 205–207, 111 S.Ct. 1196. Because the PDA is specifically designed to provide relief to working women and to

---

**15.** The legislative history of the PDA specifically embraces the dissenting opinions of Justices Brennan and Stevens in *Gilbert* as "correctly" interpreting Title VII. *Guerra*, 479 U.S.

at 278 n. 6, 107 S.Ct. 683; *Grant v. General Motors Corp.*, 908 F.2d 1303, 1307 n. 10 (1990).

end discrimination against pregnant workers, it does not preclude preferential treatment of pregnant workers. *Guerra*, at 285–86, 107 S.Ct. 683; *Harness v. Hartz Mountain Corp.*, 877 F.2d 1307, 1310 (6th Cir.1989).

### b. *Title VII and Preemption*

■■■ In Title VII, Congress explicitly addressed the issue of preemption, disclaiming any intent to categorically preempt state law or to "occupy the field" of employment discrimination law and indicating that state laws will only be preempted if they actually conflict with federal law. *Guerra*, 479 U.S. at 281, 107 S.Ct. 683. Congress' intent regarding preemption can be found in the following two sections of the Civil Rights Act of 1964:

> Nothing in this title shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this title.

42 U.S.C. § 2000e–7 ("Section 708").

> Nothing containing in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of State laws on the same subject matter, nor shall any provision of the Act be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this Act, or any provision thereof.

42 U.S.C. § 2000h–4 ("Section 1104"). Sections 708 and 1104 "severely limit" Title VII's preemptive effect. *Guerra*, 479 U.S. at 282, 107 S.Ct. 683. In addition to these provisions narrowing the preemptive reach of Title VII, courts generally apply a presumption against the preemption of state police power regulations. *Cipollone*

*v. Liggett Group, Inc.*, 505 U.S. 504, 518, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) (holding that "absent clear and manifest direction from Congress, historic police powers of the states will generally not be superseded by the federal law.") As tort law has been traditionally regulated by the states, a presumption operates against any implicit preemption of it. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 250–51, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) ("Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted.")

■■■ Federal law actually conflicts with state law only if it renders compliance with both federal and state law a "physical impossibility" or if the state law stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Guerra*, 479 U.S. at 281, 107 S.Ct. 683. Under the "physical impossibility" approach, a state law is only preempted where there is an "inevitable collision between the two schemes of regulation" and compliance with both is not theoretically possible. *Id.* at 291, 107 S.Ct. 683 (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)). In *Guerra*, the Court held that a California law which singles out pregnant women for disability benefits is not preempted because it does not compel employers to treat pregnant women better than other disabled employees, noting that "[e]mployers are free to give comparable benefits to other disabled employees." *Id.* Under the "obstacle" approach, preemption only occurs if the state law so frustrates the federal law that its purpose cannot otherwise be accomplished. *Hines v. Davidowitz*, 312 U.S. 52, 67 n. 20, 61 S.Ct. 399, 85 L.Ed. 581 (1941). In determining whether

a state law operates as a sufficient obstacle, courts must examine the federal statute as a whole and identify its purpose and intended effects. *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). While there is no rigid distinction between "impossibility" and "obstacle" conflict preemption, the former focuses on the ability of private parties to comply with both sets of provisions while the latter considers whether the objectives of the federal statute are frustrated. *Id.* at 373 n. 6, 120 S.Ct. 2288.

### c. *Johnson Controls and the Relationship Between the PDA and State Tort Law*

The intersection of the PDA, fetal injuries, and state tort law was discussed, but left unsettled, by the U.S. Supreme Court in *Johnson Controls.* In *Johnson Controls,* the Supreme Court struck down a fetal protection policy that excluded all fertile women from working in a battery manufacturing plant based on the employer's concerns regarding harm to unborn children of its female employees. 499 U.S. at 192, 198, and 211, 111 S.Ct. 1196. The Supreme Court held that Title VII, and in particular the PDA, protects pregnant employees' rights to balance work and family and to decide whether to become pregnant and whether to work while pregnant. *Id.* at 206–207 and 211, 111 S.Ct. 1196. In so holding, the Supreme Court rejected Johnson Controls' defense of its fetal protection policy based on its purported moral and ethical concerns for welfare of future children.

While the Court was unanimous in its judgment, justices disagreed about the potential implications of the holding for state tort law. The majority opinion, authored by Justice Blackmun, discounted as unlikely the potential conflict between an employer's obligations under Title VII and state tort law. He explains that

If under general tort principles, Title VII bans sex-specific fetal-protection policies, the employer fully informs the woman of the risk, and the employer has not acted negligently, the basis for holding an employer liable seems remote at best.

*Id.* at 208, 111 S.Ct. 1196. However, Justice Blackmun suggested that tort liability may be preempted if it makes compliance with Title VII's clear command impossible. *Id.* at 209, 111 S.Ct. 1196. In contrast, Justice White, in a concurring opinion, argued that a fetal-protection policy would be justified under Title VII if the employer could show that exclusion of women from certain jobs was reasonably necessary to avoid substantial tort liability. *Id.* at 212, 111 S.Ct. 1196. Because every state allows children born alive to recover in tort for prenatal injuries caused by third parties, Justice White warned that the possibility of tort liability was not merely hypothetical. *Id.* at 213, 111 S.Ct. 1196. Moreover, he noted that "it is far from clear that compliance with Title VII will preempt state tort liability," *Id.* at 213, 111 S.Ct. 1196.

*Johnson Controls* leaves both the employer and the pregnant employee with unresolved questions. For the employer, the question involves whether compliance with the mandates of the PDA could potentially subject them to liability for fetal injuries. Pregnant women, on the other hand, face the uncertainty of their legal rights in a potentially hazardous workplace and the legal rights of their children who turn out to be born with injuries allegedly caused, at least in part, by employer negligence. At least three different types of cases, relevant to the questions presented in this case, may result from these separate quandaries:

1) A pregnant employee seeks a transfer to another position because of fetal

health concerns, her employer denies the transfer, the pregnant employee quits or is constructively terminated, and the pregnant employee sues for discrimination under Title VII.

2) A pregnant employee seeks a transfer to another position because of fetal health concerns, her employer grants the transfer, the employer is sued for reverse discrimination under Title VII by non-pregnant employees whose transfer requests were denied. (*Continental raises this concern* ).

3) A pregnant employee seeks a transfer to another position because of fetal health concerns, her employer denies the transfer, the pregnant employee continues to work in her same position, she gives birth to a child with fetal injuries, and the employer is sued under state tort law. (*This is essentially the fact pattern raised by this case* ).[16]

Few courts have addressed any of these questions. Neither party has cited a single case directly on point, and this Court has independently found none. The only reported cases address the situation in which a pregnant women seeks a transfer to protect the health of her fetus, that request is denied, and she quits or is terminated and then sues for discrimination under Title VII. The few courts that have explicitly addressed this issue have held that the women have no recourse under Title VII. *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1311–1313 (11th Cir. 1999); *Armstrong v. Flowers*, 33 F.3d 1308, 1313–1317 (11th Cir.1994); *Duncan v. Children's Nat. Medical Center*, 702 A.2d 207, 210–211 (D.C.App.1997) (rejecting a wrongful termination claim based, in part, on the public policy reflected in the PDA). While these courts recognized the decisional autonomy guaranteed by the PDA and did not find that the PDA precluded employers from taking pregnancy into account, they concluded that the PDA does not require employers to "accommodate" pregnant women.[17]

d. *The PDA and Richard Asad's Negligence Claim*

This case requires the Court to coalesce several disparate principles into a cohesive statement on the relationship between the PDA and Richard Asad's negligence

16. A similar, but slightly different situation might arise, where a pregnant employee does not seek a transfer, she gives birth to a child with fetal injuries, and the employer is sued under state tort law.

17. The Eleventh Circuit's opinion in *Armstrong* is particularly illustrative of this approach. In *Armstrong*, a pregnant nurse was terminated by her employer for refusing to treat an HIV-positive patient because of concerns about the health of her fetus. 33 F.3d at 1310–11. Under Title VII and the PDA, the nurse challenged the hospital's policy of requiring nurses to treat without exception patients to whom they are assigned as discriminatory because its impact fell disproportionately on pregnant women. *Id.* at 1315. She argued that the policy unlawfully forces a woman to choose between her job and the health of her fetus. *Id.* While recognizing that the PDA gives woman the right to choose

how to balance work and pregnancy, the Eleventh Circuit disagreed, concluding that employers need not ease this decision-making process by making alternative work available to pregnant woman, even if they had fetal health concerns. *Id.* Specifically, it noted that:

The right to make this decision rests with the woman. She may choose to continue working, to seek a work situation with less stringent requirements, or to leave the workforce. In some cases, these alternatives may, indeed, present a difficult choice. But it is a choice that each woman must make.

*Id.* According to the Eleventh Circuit, the PDA imposes no affirmative obligations on the employer but rather simply protects a pregnant employee's right to remain in the workplace despite her, or her employer's, concerns about risks to the fetus. *Id.* at 1316.

claim.[18] The United States Supreme Court and the Sixth Circuit, in interpreting the PDA, have established the following principles:

1) Sex-specific fetal protection policies imposed by employers on pregnant women violate Title VII. [*Johnson Controls*]

2) Title VII and the PDA preserve the decisional autonomy of women with regard to pregnancy and work and serve to eradicate stereotypes about the ability of pregnant women to work. [*Johnson Controls* and *Guerra*]

3) Title VII does not preclude state laws or employment policies which "take account of" pregnancy so long as these policies are not based on invidious stereotypes and do not disadvantage women. [*Guerra* and *Harness*]

4) Title VII's preemptive effect should be narrowly construed. [*Guerra*]

5) A presumption operates against the preemption of state tort law. [*Cipollone, Rice,* and *Silkwood*]

In this case, Continental argues that it is impossible for it to comply with the mandates of Title VII and state tort law, and therefore, to the extent that it would otherwise face any liability under state tort law, that state law should be preempted.[19] Assuming Richard Asad possesses an otherwise viable negligence claim for Conti-

nental's failure to transfer his mother, Continental argues that any such transfer, outside the confines of its written transfer policy, would violate Title VII because it would amount to preferable treatment for pregnant women. Relying extensively on dicta in the Fifth Circuit's decision in *Urbano v. Continental Airlines, Inc.,* 138 F.3d 204 (5th Cir.1998), Continental argues that granting Ms. Asad the transfer would be giving her a benefit men are ineligible to receive, which it asserts is not permissible under Title VII. 138 F.3d at 208 n. 2 (noting that "it could be argued that granting pregnant employees a benefit men are ineligible to receive" is not permissible under Title VII). In essence, Continental argues that its hands were tied here because it was impossible to comply with both Title VII and state tort law.[20]

Continental's reliance on the *Urbano* dicta is misguided because Title VII and the PDA do not require employers to ignore pregnancy. As made evident by Justice Brennan in *Gilbert,* by the legislative history of the PDA, and by the Supreme Court in *Guerra,* anti-discrimination laws should not be applied in a social vacuum devoid of a proper understanding of existing stereotypes. The PDA prevents employment policies which discriminate against pregnant women but it does not preclude policies which take into ac-

---

**18.** For the limited purpose of its preemption analysis, the Court will sometimes accept plaintiffs' allegations or assume Continental's tort liability. While such references are necessary for this discussion, the Court makes no conclusions about the safety of Continental's workplace or its liability to the Asads.

**19.** Insofar as preemption of state tort law by the PDA would leave injured children without recourse against third-party tortfeasors, the result would be inconsistent with Congressional intent to limit the preemptive effect of Title VII and contrary to the presumption against preemption of state tort law, an area

historically regulated by the states. As noted by the U.S. Supreme Court in *Silkwood,* "[i]t is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by [negligent] conduct." 464 U.S. at 250–51, 104 S.Ct. 615.

**20.** While Continental also suggests that granting Ms. Asad's transfer requests is analogous to the fetal protection policy struck down in *Johnson Controls,* it is evident these two situations are quite different and that the issue presented by this case was not reached by the U.S. Supreme Court in *Johnson Controls.*

count the reality of pregnancy to assist women in balancing the work and family conflict.[21] Accordingly, while *Johnson Controls* demonstrated that employers could not prevent women who are or who may become pregnant from working in an environment that may be hazardous to a fetus, the PDA and Title VII should not prevent an employer from temporarily transferring a pregnant women, at her request, for the protection of her fetus. A transfer under such circumstances would preserve the decisional autonomy of the pregnant woman, is not based on stereotypical notions to preclude the employment of women, and in itself does not violate Title VII.

Because Title VII has been interpreted to have a limited preemptive effect, because of the presumption against preemption in areas historically regulated by states, and because Continental could comply with both state and federal law, a finding of preemption is not warranted in this case. While Continental must navigate between the mandates of Title VII and state tort law, it is not left with an impossible choice. The PDA "does not prevent an employer from treating pregnant employees more beneficially than it treats other employees." *Aubrey v. Aetna Life Ins. Co.*, 886 F.2d 119, 123 (6th Cir. 1989). Employers might "take pregnancy into account" by informing pregnant employees of risks associated with the workplace environment and granting temporary transfers to pregnant women who request them.[22] Unlike the unlawfully discriminatory policy at issue in Johnson Controls, such a policy is one which might leave decisional autonomy with the woman, protect the job security of pregnant women, and level the playing field for male and female workers.[23] While such alternatives may impose additional costs on employers, the U.S. Supreme Court has made clear that the "extra cost of employing members of one sex . . . does not provide an affirmative Title VII defense for a discriminatory refusal to hire members of that gender." *Johnson Controls*, 499 U.S. at 210, 111 S.Ct. 1196. It is of course left to the employer to decide how best to comply with state tort law.

In conclusion, where, as here, state law does not render employers incapable of compliance with the mandates of the PDA and Title VII, the state law is not preempted. Accordingly, Title VII does

21. As the Court is not faced with question of whether the PDA itself imposes any affirmative obligations on the part of the employer to take pregnancy into account in fashioning its employment policies, it does not reach that issue. Whether or not the PDA requires such measures, it is evident that the PDA does not prevent them.

22. For instance, in *Duncan v. Children's Nat. Medical Center,* the employer had a Pregnancy and Radiation Plan which governed the exposure of pregnant employees to radiation and which required, among other things, the employer to advise pregnant workers of the potential risks of radiation exposure, to monitor exposure levels on a monthly basis by issuing a radiation monitoring badge to pregnant employees while performing duties in radiation exposure areas, and to accommodate transfers to other departments if possible. 702 A.2d at 209. Without commenting on the adequacy of such a plan to protect a company from tort liability, the Court simply points to it as an example of the type of measures employers may take to address the safety of pregnant workers and their fetuses.

23. Even if a reverse discrimination claim might arise, an employer might assert the health and safety of pregnant women and *their fetuses as a legitimate non-discriminatory* reason for its action. As was made evident in *Johnson Controls* such a justification can fail if it is used to exclude pregnant women *from the workforce, but such a justification* would achieve the PDA's goal of protecting women's right to both work and have a family.

not preempt state tort law claims for fetal injuries caused by a negligent employer.

## B.  Loss of Consortium

Continental's argument in favor of summary judgment on Darlene and William Asad's loss of consortium claims is predicated solely on the purported failure of Richard Asad's negligence claim. Because Richard Asad's negligence claim does not fail as a matter of law, Continental is not entitled to judgment as a matter of law on the loss of consortium claims.

## IV.  CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is denied.

IT IS SO ORDERED.